## ADITYA B. MUKERJI AND SWATAI MUKERJI, ET AL.,[1] PETITIONERS v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 34129-84, 39312-84     Filed October 29, 1986.
7386-85.

*Edward C. Rustigan, Joel V. Williamson* and *Thomas C. Durham*, for the petitioners.
*Michael W. Bitner*, for the respondent.

FAY, *Judge*: Respondent determined deficiencies in and additions to petitioners' Federal income tax liability as follows:

| Petitioners | Year | Deficiency | *Additions to tax* | | |
| | | | *Sec. 6653(a)(1)[2]* | *Sec. 6653(a)(2)* | *Sec. 6659* |
| --- | --- | --- | --- | --- | --- |
| Aditya B. and | 1981 | $4,488 | $224 | (*) | $1,346 |
| Swati Mukerji | 1982 | 23,189 | 1,159 | (*) | 6,957 |
| Charles F. and | 1980 | 16,641 | 832 | - - - | 0 |
| Judith Hurchalla | 1981 | 23,537 | 1,177 | (*) | 0 |
| Larry B. and | 1981 | 20,868 | 0 | 0 | 0 |
| Beverly W. Thrall | | | | | |

\* To be determined.

After concessions by petitioners and the severance of another issue in docket No. 34129-84 pursuant to Rules 61(b) and 141(b),[3] the sole remaining issues in the instant cases are (1) whether petitioners are entitled to various

---

[1]Cases of the following petitioners are consolidated herewith: Charles F. Hurchalla and Judith Hurchalla, docket No. 39312-84; and Larry B. Thrall and Beverly W. Thrall, docket No. 7386-85. Furthermore, the instant cases control several hundred cases currently at the administrative level which are held in suspense pending the outcome of these cases.

[2]Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as amended and in effect during the taxable years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.

[3]See *Noonan v. Commissioner*, T.C. Memo 1986-449.

deductions claimed in connection with certain computer equipment; (2) whether petitioners Aditya B. Mukerji and Swati Mukerji and petitioners Charles F. Hurchalla and Judith Hurchalla are liable for additions to tax under section 6653(a)(1); (3) whether petitioners Aditya B. Mukerji and Swati Mukerji and petitioners Charles F. Hurchalla and Judith Hurchalla are liable for additions to tax under section 6653(a)(2); (4) whether petitioners Aditya B. Mukerji and Swati Mukerji are liable for additions to tax under section 6659; and (5) whether petitioners are liable for the additional interest amount determined under section 6621(d).

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by reference.

Petitioners Aditya B. Mukerji and Swati Mukerji resided in Piedmont, California, when they filed their petition herein. Petitioners Charles F. Hurchalla and Judith Hurchalla resided in Exton, Pennsylvania, when they filed their petition herein. Petitioners Larry B. Thrall and Beverly W. Thrall resided in Los Angeles, California, when they filed their petition herein.[4]

Each petitioner purchased computer equipment during the years in issue and leased such equipment to Comdisco, Inc. (herein Comdisco), for a term of 7 years. For clarity, we will separately state the facts of each transaction.

*The Mukerji Transaction*

Petitioner Aditya B. Mukerji (herein Mukerji) was employed in 1982 by Bateman Eichler, Hill Richards, Inc. (herein Bateman Eichler), as a vice president in charge of institutional investment, dealing with institutional investors with respect to fixed income investments.

In 1982, Mukerji purchased various items of used computer equipment from CDC Sales & Leasing, Inc. (herein CDC), a wholly owned subsidiary of Comdisco, for a total

---

[4] "Petitioners" or "petitioner," as used hereinafter, refers only to the male petitioners unless otherwise indicated.

purchase price of $150,000, plus $2,475 in fees and commissions. Mukerji purchased the following items of computer equipment, all of which were manufactured by IBM:

| Item | Quantity | Purchase price |
|------|----------|----------------|
| 3880-1 Storage control unit | | |
| 8170 Two channel switch | 2 | $148,000 |
| 3340-A2 Disk drive storage unit | 1 | 2,000 |

Mukerji made a cash downpayment of $5,813 on December 5, 1982. For the remainder of the purchase price, Mukerji executed two recourse promissory notes with CDC, one in the sum of $18,975 (herein promissory note) and the other in the amount of $127,687 (herein installment note). Mukerji made payments under the promissory note as follows:

| Date | Principal | Interest |
|------|-----------|----------|
| May 15, 1983 | $11,574 | $651 |
| May 15, 1984 | 7,401 | 1,526 |

The installment note was payable in seven annual installments with the first payment to commence on January 1, 1984.

Mukerji also executed a security agreement whereby he assigned a security interest in the equipment and other collateral to CDC as security for his obligation under the installment note and the promissory note. Immediately after the purchase, Mukerji leased to Comdisco the equipment under a net lease for a term of 7 years ending on December 31, 1989. The lease executed between Mukerji and Comdisco was a net lease in that Comdisco agreed to pay property taxes and certain other taxes, insurance, and maintenance costs. The use of net leases is a standard commercial practice in the computer industry. Upon the expiration of the lease, Comdisco would tender the equipment to Mukerji at a location designated by Mukerji.

At the time Mukerji purchased his equipment, each item of equipment was subject to an existing lease between Comdisco and an end-user which became a sublease upon Mukerji's purchase of the equipment. Both of the 3880-1 storage control units were subject to a sublease to North Carolina National Bank. The 3340-A2 disk drive storage

unit was subject to a sublease to Schweber Electronics Corp. Mukerji was aware of North Carolina National Bank's financial position and was favorably impressed.

Payments of rental obligations (herein basic rent) by Comdisco to Mukerji under the equipment lease are due in seven annual installments, beginning on January 1, 1984, and ending on January 1, 1990, and exactly matched in timing with the payments under the installment note Mukerji made with CDC. The amount of basic rent payments due from Comdisco pursuant to the terms of the lease agreement also exactly matched Mukerji's debt payments under his installment note with CDC.

In addition to Comdisco's obligation to pay basic rent for 7 years, the lease agreement between Mukerji and Comdisco also provides that beginning on January 1, 1987, Comdisco would be obligated to pay "additional rent" to Mukerji. Additional rent is defined in such lease agreement as an amount equal to 100 percent of the gross rentals actually received by Comdisco from sublessee end-users of Mukerji's equipment, until Mukerji has received $15,248 (10 percent of the purchase price of his equipment, plus fees and commissions). Thereafter, Mukerji would receive an amount equal to 50 percent of the gross rentals actually received by Comdisco from sublessee end-users. Additional rent would be payable quarterly and would constitute a positive cash flow to Mukerji, i.e., cash receipt after the payment under the installment note.

Comdisco's obligation to pay basic rent to Mukerji is unconditional and is not contingent upon Comdisco's success in subleasing Mukerji's equipment. Although the amount of additional rent which Comdisco was obligated to pay Mukerji would be measured by the amount Comdisco receives from its sublessees, the obligation to pay such additional rent is that of Comdisco and not that of Comdisco's sublessees.

Mukerji's purchase was part of a program structured by Comdisco and Bateman Eichler which offered purchasers the opportunity to purchase packages of IBM peripheral computer equipment in a leveraged sale-leaseback transac-

tion.[5] Bateman Eichler served as the dealer-manager of this program which was made pursuant to a private placement memorandum dated November 5, 1982.[6]

Mukerji first became aware of the offering from an internal memorandum prepared by the tax advantaged investment department of Bateman Eichler which was circulated to Bateman Eichler's account executives. Through his employment with Bateman Eichler, Mukerji was aware that in selecting investment opportunities, Bateman Eichler relied upon both its internal resources and upon outside experts. Bateman Eichler's internal resources included its tax advantaged investment department and a 15-member research department. Becoming somewhat interested, Mukerji attended a meeting arranged for Bateman Eichler account executives at which the Comdisco offering was discussed in detail. After this meeting, Mukerji discussed further the Comdisco offering with members of Bateman Eichler's tax advantaged investment department. Mukerji also spoke with Bateman Eichler's vice president in charge of computer industry research. He reviewed several research reports on Comdisco, the private placement memorandum distributed with respect to the offering in 1982, and private placement memoranda which had been distributed in previous equipment offerings by Comdisco.

In his examination of the private placement memorandum, Mukerji paid close attention to the financial projections therein which set forth the positive cash-flow, rental obligations, tax aspects, debt service, and similar information. Mukerji reviewed and relied upon an appraisal contained in the private placement memorandum that was prepared by Kenneth B. Steinback (herein Steinback). Steinback is the president of Computer Sales International, Inc., a dealer and lessor of new and used data processing equipment and a member of the Computer Dealers/Lessors Association. Such appraisal discussed both the then-current fair market value of the equipment described in the memorandum and its projected residual value as of the end

---

[5]Peripheral computer equipment, as explained more fully below, feeds information into and out of the central processing unit of a computer.

[6]The private placement memorandum provided for the sale of a maximum of 667 packages of equipment worth approximately $150,000 each, or a total of approximately $100 million worth of equipment.

of 1989 (the termination of Mukerji's lease to Comdisco). Such appraisal also contained Steinback's opinion with respect to the amount of cash-flow a purchaser might expect pursuant to a percentage rental provision in the lease Mukerji subsequently executed with Comdisco.

Mukerji was aware that the equipment involved in the Comdisco offering was peripheral computer equipment which historically had a longer economic life than mainframe equipment or central processing units.

The private placement memorandum stated that "The principal objectives of a purchaser of an Equipment package should be realization of a cash return from rentals under the Lease during the later years of the Lease and on the re-leasing or sale of the Equipment at the end of the Lease, and the utilization of anticipated tax benefits during the terms [sic] of the Lease." The memorandum also contained a detailed description of the secondary market for IBM computer equipment, including the factors affecting the residual value of peripheral equipment. This description included a chart which displayed historical residual values of certain items of IBM peripheral equipment.

The private placement memorandum estimated that the residual value of the equipment after the 7-year lease with Comdisco will be at least 10 percent of the purchase price of $150,000, or $15,000, on Mukerji's out-of-pocket cash investment of $24,788. The estimate in the private placement memorandum is consistent with Mukerji's conclusion after his review of the documents and his discussions with Bateman Eichler's personnel. Mukerji was also advised that the fair market value appraisals of the equipment offered for sale in the private placement memorandum were conservative estimates.

The private placement memorandum estimated that net tax savings at the end of the term of the lease with Comdisco would be $13,481 on Mukerji's initial cash investment of $24,788. The private placement memorandum shows that in 1987 the transaction would reach a "turn around" point after which Mukerji would pay increased taxes as a result of entering into the transaction. Based on the private placement memorandum, any additional rent or residual value received by Mukerji will further reduce the

net tax savings of his investment. Net tax savings were calculated on the assumption that a 50-percent tax rate would apply to the taxable income or loss resulting from each year of the transaction.

On their 1982 joint Federal income tax return, petitioners Aditya B. Mukerji and Swati Mukerji claimed a depreciation deduction of $22,500 with respect to their computer equipment purchased from CDC. Respondent disallowed such deduction in his notice of deficiency issued July 2, 1984.[7]

### The Hurchalla Transaction

On his Federal income tax return for 1981, petitioner Charles F. Hurchalla (herein Hurchalla) listed his occupation as "executive." Hurchalla holds a master's degree in business administration from Temple University, and in 1981 he was the owner and president of Petron Trading Co., an oil marketing and trading firm.

On December 30, 1980, Hurchalla executed an equipment purchase agreement with Comdisco for the purchase of used computer equipment for $198,400 plus fees and commissions in the amount of $3,968. The items of equipment (all manufactured by IBM), purchased by Hurchalla and the purchase price of each, are set forth below:

| Item | Quantity | Purchase price |
|------|----------|----------------|
| 3350-A2 Disk drive storage unit | 1 | $40,000 |
| 3350-B2 Disk drive storage unit | 5 | 158,000 |

Hurchalla made a cash downpayment of $9,920 on December 27, 1980. Pursuant to an option to defer payment provided in the equipment purchase agreement, Hurchalla made subsequent cash payments to Comdisco as follows:

| Date | Principal | Interest |
|------|-----------|----------|
| Feb. 4, 1981 | $20,832 | $416.64 |
| Feb. 10, 1982 | 12,896 | 1,805.44 |

To finance the remaining portion of the purchase price of his equipment, Hurchalla executed an installment note with Continental Illinois National Bank & Trust Co. of Chicago (Continental Bank) in the principal amount of $158,720.

---

[7]Respondent also made other adjustments in his notice of deficiency. The only issue here, however, is the depreciation deduction with respect to the equipment.

Hurchalla also executed a security agreement pursuant to which he assigned a security interest in the equipment and other collateral to Continental Bank as security for his obligations under the installment note.[8] The installment note with Continental Bank was a recourse note to the extent of 79.5 percent of the principal amount in that Hurchalla's personal liability for repayment of that portion of the note was not limited. However, the first 20.5 percent of the principal amount of the note was payable only from Comdisco's obligation to pay rent and the collateral contained in the security agreement.[9]

Immediately after Hurchalla purchased his equipment from Comdisco, he leased it back to Comdisco for a term ending on December 31, 1987. Hurchalla's lease with Comdisco was a net lease. Upon the expiration of the lease, Comdisco will tender the equipment to Hurchalla at a location designated by Hurchalla. At the time Hurchalla purchased his equipment, each item of equipment was subject to an existing lease between Comdisco and American Telephone & Telegraph Communications, Inc., which became a sublease upon Hurchalla's purchase of the equipment.

Through March of 1986, the amount of rent which Comdisco is obligated to pay to Hurchalla pursuant to the terms of the lease agreement exactly matches the amount of debt payments which Hurchalla is obligated to make to Continental Bank pursuant to the terms of Hurchalla's promissory note. Payments on the promissory note with Continental Bank are also due on the same dates as Comdisco's rent payment to Hurchalla. Payments of rent by Comdisco to Hurchalla are due quarterly in arrears, with the first payment to be made on April 1, 1981. Succeeding payments will be due on July 1, October 1, January 1, and April 1 of each year with the last payment to be made on January 1, 1988.

---

[8]Such other collateral consists of Hurchalla's rights and interest under the lease agreement, his rights to all present and future rental payments, and other amounts payable under the lease between him and Comdisco, and his rights and interest under the equipment purchase agreement with Comdisco.

[9]As stated below, Hurchalla leased the equipment to Comdisco and the amount of rental payments from Comdisco to Hurchalla match in amount and timing Hurchalla's payments under the installment note. The first 20.5 percent of the note would have been repaid completely from Comdisco's rental payments by April 1983.

Commencing April 1, 1986, quarterly rental payments under Hurchalla's lease with Comdisco will exceed Hurchalla's debt service payments to Continental Bank. Thereafter, the rent payments will provide a positive cash-flow to Hurchalla in the following amounts—

| Year | Positive cash-flow |
| --- | --- |
| 1986 | $5,776 |
| 1987 | 7,701 |
| 1988 | 1,747 |

In this respect, Hurchalla's transaction differs from Mukerji's in that the net cash-flow to Hurchalla is fixed and is not dependent upon Comdisco's success in subleasing Hurchalla's equipment.

Hurchalla first became aware of the Comdisco equipment offerings through his broker, Charles D'Amico (herein D'Amico). D'Amico, Hurchalla's broker for 15 years, is an employee of Moseley, Hallgarten, Estabrook & Weeden, Inc. (herein Moseley), a financial services organization offering securities brokerage and trading, investment banking, and other financial services.

Hurchalla's purchase is part of a program structured by Moseley and Comdisco which offered purchasers the opportunity to purchase packages of IBM peripheral computer equipment in a leveraged sale-leaseback transaction. This offering was made pursuant to a private placement memorandum dated November 25, 1980.[10]

At Hurchalla's request, D'Amico sent a copy of the private placement memorandum to John Devlin (herein Devlin), Hurchalla's accountant. Hurchalla reviewed the private placement memorandum which included an appraisal prepared by Richard Forsythe (herein Forsythe). Forsythe is the president of Forsythe/McArthur Associates, Inc., a broker and dealer of used IBM equipment. Such appraisal set forth Forsythe's opinions concerning both the current fair market value of the equipment described in the memorandum and its projected residual value as of the end of 1987, at the termination of Hurchalla's lease with Comdisco.

---

[10]The private placement memorandum provided for the sale of a maximum of 49 packages of equipment worth approximately $200,000 each, or a total of approximately $9.8 million worth of equipment.

The financial projections which were included in the private placement memorandum showed that in 1985 the transaction would reach a "turn around" point after which Hurchalla would pay increased taxes as a result of entering into the transaction. For this reason, the net tax savings associated with Hurchalla's investment were considerably less than his initial out-of-pocket cash investment. The private placement memorandum indicated that the net tax savings for taxpayers in the 70-percent and 60-percent tax brackets would be $21,625 and $18,536, respectively. Hurchalla's out-of-pocket cash investment in the equipment purchase is $43,648.

Hurchalla is knowledgeable with respect to computer equipment. He had studied computer science and data processing in the course of earning his master's degree in business administration. In addition, during his previous employment with several oil companies, Hurchalla had worked with others on computer programs concerning oil marketing. He had also been involved with the development of a software program designed to meet the special needs of oil marketing companies and has invested approximately $50,000 in developing this program. Through upgrading his company's computer system, Hurchalla learned that peripheral computer equipment has a longer economic life than central processing units.

In the course of evaluating the Comdisco transaction, Hurchalla discussed the equipment involved with Bart Whittaker (herein Whittaker), a neighbor who worked for IBM. Whittaker told Hurchalla that he found no material errors in the appraisal of the equipment's fair market value and projected residual value. Hurchalla also discussed the value of the equipment with a neighbor who worked for Burroughs Corp. Hurchalla discussed the Comdisco offering with his attorney and Devlin. Hurchalla and Devlin together reviewed the projections of cash-flow and residual value contained in the private placement memorandum.

Hurchalla also reviewed the financial status of Comdisco and learned that Comdisco was a large customer of IBM equipment. Hurchalla was impressed by Comdisco's performance. He also learned that IBM had 70 to 75 percent of the computer market and he therefore felt comfortable in

the purchase of IBM equipment. Furthermore, at the time he reviewed the private offering memorandum, Hurchalla was aware that one of the sublessee end-users of the equipment he would purchase was American Telephone & Telegraph Communications, Inc., in which he placed much confidence.

Hurchalla acknowledged that the equipment he purchased must yield a residual value of approximately 15 percent of its purchase price for him to break even on his out-of-pocket cash investment. Based upon his review of the Comdisco offering, Hurchalla expected that a purchase of the equipment described in the offering would yield a return of approximately 25 percent on his investment. Hurchalla recognized that there were risks involved in purchasing computer equipment, however, his investigation indicated that the risks in the Comdisco offering were reasonable. The appraisal letter by Forsythe in the private offering memorandum indicated that Hurchalla's equipment would be worth $39,680 in December 1987, the end of Hurchalla's lease with Comdisco. This amount, when added to the cash-flow Hurchalla could expect under the lease with Comdisco, would produce a return of $54,904 on an initial cash investment of $43,648. Hurchalla and his advisers concluded that the Forsythe/McArthur Associates, Inc., appraisal was a realistic projection of the equipment's anticipated residual value. Hurchalla understood that technological advances could make his equipment less valuable than anticipated. However, he believed that these risks were reasonable under the circumstances and recognized that similar risks are often encountered in commercial transactions.

On their 1980 joint Federal income tax return, petitioners Charles F. Hurchalla and Judith Hurchalla reported a depreciation deduction of $30,355[11] with respect to the equipment purchased from Comdisco. On their 1981 Federal income tax return, they reported a depreciation deduction of $52,272, a fee amortization deduction of $1,020, and an interest deduction of $21,444 with respect to the equipment. The 1981 return showed rental income from Comdisco of $31,722 with respect to the equipment. Respondent by

[11] This amount includes fee amortization of $596.

notice of deficiency dated August 23, 1984, disallowed the claimed deductions.

### The Thrall Transaction

On his 1981 Federal income tax return, petitioner Larry B. Thrall (herein Thrall) listed his occupation as "attorney."

In 1978, Thrall became the president of International Investment Group, a real estate investment company. At the time of trial, Thrall was the managing partner of a real estate investment partnership which invests in real estate projects.

On December 17, 1981, Thrall executed an equipment purchase agreement with Comdisco for the purchase of certain used computer equipment for a total purchase price of $400,000 plus $7,000 in fees and commission. The items of equipment purchased by Thrall (all of which are manufactured by IBM), and the purchase price of each, are set forth below:

| IBM model number | Quantity | Purchase price |
| --- | --- | --- |
| 3271-2 Control unit | | |
|   3250 Device adapter | | |
|   7821 4800/7200 BPS | 1 | $2,900 |
| | | |
| 3277-2 Display station | | |
|   4631 66 Key EBCDIC typewriter | 12 | 16,800 |
| | | |
| 3286-2 Printer | 3 | 4,500 |
| | | |
| 3350-A2 Disk drive storage unit | | |
|   8150 String switch | 2 | 111,600 |
| | | |
| 3350-B2 Disk drive storage unit | 4 | 158,400 |
| | | |
| 3350-C2 Disk drive storage unit | | |
|   8150 String switch | 2 | 105,800 |

Thrall made a downpayment of $15,240 on December 22, 1981, toward the purchase of his equipment. Pursuant to an option to defer payment provided in the equipment purchase agreement, Thrall made subsequent cash payments to Comdisco as follows:

| Date | Principal | Interest |
|------|-----------|----------|
| May 14, 1982 | $37,130 | $2,088 |
| May 13, 1983 | 18,630 | 3,842 |

Thrall financed the remaining portion of the purchase price of his equipment in a similar manner as Hurchalla, through an installment note with Continental Bank in the principal amount of $336,000. However, 68.1548 percent of the note executed by Thrall was recourse, and the first 31.8452 percent is payable solely out of Comdisco's obligation to pay rent and from certain collaterals contained in the security agreement.[12]

Immediately after Thrall purchased his equipment, he leased it back to Comdisco for a term ending on December 31, 1988, under arrangements similar to Hurchalla's lease arrangement with Comdisco. At the time Thrall purchased the equipment, all 12 of the 3277-2 display stations, and accompanying keyboards, were subject to an existing lease to Miller Electric Manufacturing Co. The 3271-2 control unit and all three of the 3286-2 printers were subject to an existing lease to Duracell International, Inc. Both of the 3350-A2 disk drives, both of the 3350-C2 disk drives, and all four of the 3350-B2 disk drives were subject to an existing lease to Lucky Stores, Inc.

Through 1986, the amount of rent which Comdisco is obligated to pay to Thrall pursuant to the terms of the lease agreement exactly matches the debt payments pursuant to the terms of the installment note which Thrall is obligated to make to Continental Bank (and subsequently The Former Witter Corp., successor to Continental Bank's interest).[13] Payments under the installment note are due on the same dates as the rental payments from Comdisco to Thrall. Payments of rent by Comdisco to Thrall are due annually in arrears, with the first payment to be made on January 1, 1983. Succeeding payments are due on January

---

[12]As we state below, Thrall leased the equipment to Comdisco, and the rental payments are identical in time and amount to the payments under the note. The first 31.8452 percent of the note would have been repaid completely from Comdisco's rental payments by January 1986 (30.0339 percent would have been repaid by January 1985).

[13]In December of 1981, Continental Bank sold Thrall's promissory note, along with those of other purchasers of computer equipment at that time, to the Former Witter Corp. (herein Witter).

1 of each year with the last payment to be made on January 1, 1989. Beginning in 1987, Comdisco's annual rental payments to Thrall will exceed Thrall's debt payments under the promissory note. Such rent payments will provide a positive cash-flow to Thrall of $6,784 per year in 1987, 1988, and 1989. As in Hurchalla's transaction, the net cash-flow which Comdisco is obligated to pay Thrall is fixed and not dependent upon Comdisco's success in subleasing Thrall's equipment.

Thrall first became aware of the Comdisco leasing programs through Steve Griffith (herein Griffith), a broker with Bateman Eichler who advises Thrall on investments. Thrall has known Griffith for over 15 years. In addition to their professional relationship, Thrall and Griffith are close personal friends.

The Comdisco program which Griffith presented to Thrall was structured by Comdisco and Moseley in November of 1981. As in the two offerings previously discussed, purchasers were offered the opportunity to purchase packages of IBM peripheral computer equipment in a leveraged sale-leaseback transaction. The offering was made pursuant to a private placement memorandum dated November 2, 1981, and a supplement thereto, dated December 23, 1981.[14]

Thrall had recently made investments in oil and gas offerings in which he had not only lost his entire capital investment but had also been called upon to make additional payments on debts involved in those investments. Thrall did not want to repeat that experience. Therefore, protection of his capital investment was crucial in his consideration.

Thrall personally reviewed the appraisal of residual value which was contained in the private placement memorandum in the 1981 Comdisco offering. The private placement memorandum for the 1981 offering is similar in format to the private placement memorandum for the 1980 offering which Hurchalla reviewed, each containing an appraisal from Forsythe. In addition to Griffith, Thrall also asked an

[14]The private placement memorandum initially provided for the sale of a maximum of 75 packages of equipment worth $200,000 each, or a total of $15 million worth of equipment. The offering was subsequently expanded to provide for the sale of over $40 million worth of equipment.

administrative assistant of 10 years to review the offering documents.

In the course of reviewing the documents relating to the Comdisco offering, Thrall learned that peripheral equipment, such as was included in the offering, is generally less susceptible to technological obsolescence than mainframe equipment or central processing units. Furthermore, Thrall had no doubt that Continental Bank would enforce its rights under the note he executed.[15] Thrall reviewed the financial status of Comdisco, and concluded that Comdisco was a reputable company which was highly successful in the leasing business.

In reviewing the Comdisco offering, Thrall understood the risks involved and felt they were reasonable under the circumstances. Thrall understood there was a risk that he would not recover even his cash investment; however, he also understood that there was a possibility of higher residual values which would lead to a large profit.

Forsythe's appraisal letter in the private placement memorandum, which Thrall reviewed, indicated that his equipment would be worth $80,000 in December 1988. This amount, when added to the cash-flow Thrall could expect under the lease with Comdisco, would produce a return of $100,352 on an out-of-pocket cash investment of $71,000.

Although Thrall recognized that there were tax benefits associated with the Comdisco investment, particularly in the first year, he was also aware of other investments which would have produced more tax benefits for a smaller cash investment. Thrall was unwilling to make any investment strictly for tax benefits, and he had communicated this view to Griffith. Thrall learned that the Comdisco investment involved a "turn around" point after which his taxes would increase as a result of the investment. The financial projections which were included in the private placement memorandum showed that this "turn around" point would occur in 1986. As a result of the "turn around" point, the estimated net tax savings of $40,504 were considerably less than Thrall's $71,000 initial cash investment.

---

[15]Respondent alluded to a pledge agreement between Comdisco and Continental Bank whereby certificates of deposit would be pledged as security for the debts of Thrall and other purchasers. The record shows that such agreement was never executed.

On their 1981 joint Federal income tax return, petitioners Larry B. Thrall and Beverly W. Thrall reported a depreciation deduction of $30,525 on a basis of $203,500 with respect to the equipment purchased from Comdisco. By notice of deficiency dated January 3, 1985, respondent disallowed the claimed deduction. In an amendment to their petition, petitioners Larry B. Thrall and Beverly W. Thrall claimed an additional depreciation deduction of $30,525 in 1981 with respect to certain computer equipment purchased by them in that year.[16]

## Comdisco and Its Leasing Business

Comdisco was formed in 1969 as a broker-dealer and lessor to engage in buying, selling, and leasing new and used IBM computer equipment. Comdisco is a publicly held corporation and is listed on the New York Stock Exchange. Comdisco's revenue was $602 million in the fiscal year ending on September 30, 1985.

Comdisco is the world's largest lessor, dealer, and remarketer of IBM computer equipment that is not affiliated with any computer equipment manufacturer. Comdisco is only second in size in the computer leasing market to IBM Credit Corp. Comdisco operates in the "third party leasing" marketplace in which lessors of IBM computer equipment buy or lease IBM equipment, either from IBM or from others, and in turn lease such equipment to end-users. Comdisco's customers are, in general, the large- and medium-size users of computer equipment throughout the world. Comdisco leases equipment to every member of the top 50 companies of the Fortune 500.

Comdisco also provides a wide range of services to its customers, such as providing consultations and seminars concerning equipment needs, upgrading installed equipment, planning computer center relocations and transportation, remarketing used equipment, and providing maintenance services. One of Comdisco's latest business activities is Comdisco disaster recovery services which provides back-up data processing facilities in the event a customer's facilities are unable to function because of a fire or other disaster.

---

[16]Thrall purchased two packages of computer equipment but initially only claimed a depreciation deduction for one package of equipment.

The existence of the third-party market and Comdisco's ability to remarket older generations of equipment are attributable to IBM's maintenance policy. IBM offers maintenance service for the equipment it manufactures whether it is in the possession of an IBM customer or a third party. This maintenance policy ensures that an item of equipment which is, for example, 5 years old will perform in the same manner, and be just as reliable, as a similar item of equipment which is brand new. Physical deterioration is thus not an important factor in the value of used equipment. For this reason, used market prices generally do not distinguish between the physical age of equipment of the same model and capability.

The business of leasing computer equipment is capital intensive and Comdisco has developed several methods of financing its growth. One of the company's methods for raising new capital is the financing of lease receivables. Generally, when Comdisco writes a lease with a lessee, it finances the lease by borrowing on a nonrecourse basis from a bank or other institutional lender. This debt is secured by the rental payments due under the lease and by the equipment.

The three transactions at issue represent another method which Comdisco employs to raise capital. In each of these transactions, Comdisco sold some of its equipment, thus further reducing, or eliminating, the company's capital investment in the equipment. The combination of these and other methods of financing allows Comdisco to preserve and increase its capital to grow and purchase new equipment.

### Description and History of the Equipment

All of the equipment involved in the three transactions herein is peripheral equipment which was manufactured by IBM. Generally, computer equipment can be divided into two broad classifications, peripheral equipment and central processing units. As noted above, peripheral computer equipment refers to the equipment in a computer system which feeds information into and out of the central processing unit. The central processing unit is the core or "brain" of a computer system which actually performs the data processing functions.

The record herein establishes that the residual value of a specific piece of computer equipment is a function of supply and demand, technological improvements in newer equipment, and the resulting gradual technological obsolescence of older equipment. In general, the rate of obsolescence is directly related to the rate of introduction of new, technologically advanced equipment.

Peripheral equipment is generally less susceptible to rapid technological obsolescence than central processing units because peripheral equipment is generally more mechanical in nature. Furthermore, older generations of peripheral equipment can be used with newer generations of central processing units. Because of the constant growth of the need for data processing services, many equipment users will replace their central processing units and add new peripheral equipment, but will also retain their previous peripheral equipment to meet the demands of growth.

Many equipment users find it advantageous to use older equipment because older equipment provides satisfactory performance at a lower cost. A very important part of Comdisco's business is its ability to remarket and derive the maximum value from older generations of equipment.

The IBM model 3350 disk drive storage units (herein 3350 disk drive) purchased by Hurchalla and Thrall are disk drive storage devices which are used to store data and programs.[17] A 3350 disk drive consists of a stack of magnetic disks on a spindle. Heads which move laterally across the disk can either record information on or read information from the disk as it rotates beneath the head. During the time of the transactions herein, the 3350 disk drive was the most widely used disk drive storage device.

An important factor in the value of the 3350 disk drive as well as that of other disk drive storage devices, is its price-performance ratio. Generally, users of data processing equipment will attempt to purchase or lease the most performance for their money. In the context of disk drive storage devices, equipment users will attempt to maximize the amount of storage capacity. As newer, more efficient

---

[17]A 3350-A2 is a "master" unit which is capable of managing a string of up to eight disk drives. A 3350-B2 is a "slave" unit which cannot operate without a master unit. A 3350-C2 can operate either as a slave unit or as a back-up master unit.

models with lower price-performance ratios are introduced onto the market, the cost of older models will drop so that the price-performance of older models will remain competitive with the newest product.

The 3350 disk drive was introduced on the market in 1976. During the period from 1976 through 1980, the price of the 3350 disk drive dropped, although the price remained at a relatively high percentage of IBM list price. In the fall of 1980, 3350 disk drives on the third-party market were selling at 95 percent of the IBM list price.

In June of 1980, IBM announced plans to introduce the 3380, (herein new 3380 disk drive) a new disk storage device more advanced than the 3350 disk drive. Subsequent to the announcement of the introduction of the new 3380 disk drive, however, IBM encountered substantial technical difficulties in producing such units. As a result, quantity deliveries of the new 3380 disk drives were delayed by as much as 2 years.

At the time IBM announced the new 3380 disk drive there was reason to believe that disk drive technology was maturing and that future developments in disk drive technology would be less dramatic than in the past. As is the case with all peripheral equipment, many of the functions in a disk drive are essentially mechanical and are less susceptible to technological improvement than purely electronic functions. The technical difficulties IBM encountered in producing the new 3380 disk drive were also an indication that any future breakthroughs in disk drive technology would probably be more expensive and less frequent than in the past.

As a result of the problems IBM encountered in producing and delivering the new 3380 disk drive, the demand for the 3350 disk drives increased substantially in 1980 and 1981. Due to this increased demand, the price for the 3350 disk drives on the third-party market increased to over 150 percent of the IBM list price for new equipment, and IBM raised the list price of the 3350 disk drive in December of 1981.

In 1982, IBM began delivery of the new 3380 disk drives in larger quantities. When large scale deliveries of the new 3380 disk drive commenced, the price of the 3350 disk

drives began to drop to bring its price-performance ratio in line with that of the more efficient new 3380 disk drives. However, large scale deliveries of the new 3380 disk drives and the resulting price drop of the 3350 disk drive did not take place until after Hurchalla and Thrall had purchased their equipment.

The 3880 storage control unit, which Mukerji purchased, was introduced on the market in 1979. The function of the 3880 storage control unit is to control the flow of information between a string of disk drives and a central processing unit. The 3880 storage control unit translates information between the formats used in the central processing unit and translates information for recording on the disks. The 3880 storage control unit also performs other necessary control-type functions.

The 3880 storage control unit can be used to control a wide variety of IBM disk drive storage devices, including the 3350 disk drives. In addition, the 3880-1 storage control units which Mukerji purchased can be upgraded to 3880-3 storage control units for less than $3,000 per unit in the field, that is to say, without the need of removal from their on-site location. As a result of this upgrading, such units can be used with the new 3380 disk drive, IBM's most advanced disk drive technology.[18]

The value of storage control units, such as the 3880 storage control unit, generally declines in proportion to the value of the disk drives with which they are used. Since the 3880 storage control unit can easily be upgraded for use with the new 3380 disk drive, the 3880 storage control unit, once upgraded, will have a useful life equal to that of the new 3380 disk drive. The useful life of the 3880 storage control unit also reflects the fact that it can be used to control a wide variety of disk drive storage devices.

Thrall purchased a small amount of IBM 3270-series terminal equipment, which was introduced in 1972. The terminal equipment purchased by Thrall represents approximately 6.1 percent of his purchase price. In general, terminal equipment has the longest useful life of all

---

[18]Any 3880-1 can be upgraded for use with new 3380 disk drives. Certain 3880-1 units with low serial numbers cannot be upgraded for use with the double-density version of the new 3380 disk drive, but may be upgraded to be used with the earlier versions of the new 3380 disk drive.

peripheral equipment since most of the cost of terminal equipment represents mechanical functions which are not susceptible to dramatic technological improvement. Certain terminal devices have commonly been used for 20 years or more.

In addition to the 3880-1 storage control units, Mukerji also purchased a 3340-A2 disk drive, a smaller disk drive than the 3350 disk drive. The 3340-A2 disk drive, which was introduced in 1973, was generally used by customers with smaller data processing requirements. The 3340-A2 disk drive which Mukerji purchased represents 1.33 percent of his purchase price.

### Expert Testimony on Fair Market Value

Svend E. Hartmann (herein Hartmann) testified for petitioners with respect to the fair market value of the equipment at the time it was purchased by petitioners. Hartmann is the president of Computer Merchants, Inc. (herein Computer Merchants), a position he has held since 1974. Computer Merchants is a dealer and lessor of IBM computer equipment.

In 1970, Computer Merchants began publishing a quarterly journal entitled the Computer Price Guide. The Computer Price Guide was the computer industry's first regularly published source of price and market information for both new and used computer equipment. Since 1970, Hartmann has been the editor of the Computer Price Guide. Since 1971, Hartmann has also been the author of a quarterly newsletter, the Readers Report, which is a supplement to the Computer Price Guide and which contains comments and evaluations of the current and expected market trends for computer peripheral equipment.

The Computer Price Guide is widely used by computer professionals and others who have a continuing need to remain informed about price trends and development in the marketplace for IBM computers. The Computer Price Guide is distributed to about 4,500 subscribers, including IBM executives, banks, insurance companies, leasing companies, accountants, and taxing authorities, including the Internal Revenue Service. Within the computer industry, the Com-

puter Price Guide is commonly referred to as the "Blue Book" of prices for used computers.

The information in the Computer Price Guide is gathered by analyzing transactions entered into by dealers throughout the country with whom Computer Merchants stays in contact, and by analyzing the transactions of Computer Merchants itself. The prices in the Computer Price Guide represent Computer Merchants' best judgment as to representative retail prices at the time each issue is published.

The Computer Price Guide is published quarterly, in January, April, July, and October. Until the October 1981 issue, the Computer Price Guide was distributed to subscribers at the beginning of the month. In October 1981, the publication schedule was changed so that the issue would be distributed in the middle of the month. This revision in publication schedule was made for better coordination with the timing of IBM announcements of price changes for its equipment. Each issue of the Computer Price Guide attempts to reflect retail prices of equipment in transactions taking place immediately before each issue's publication date.

Hartmann presented his opinion concerning the fair market value of the equipment purchased by each petitioner as of the date of the offering memorandum distributed in each transaction.[19] In determining the value of each package of equipment, Hartmann first examined the October issue of the Computer Price Guide preceding each transaction and the January issue published subsequent to the date of each transaction. Through a process of extrapolation, he then determined the fair market value as of the date of each private placement memorandum.

Hartmann in his testimony and expert report refers to a "lease premium."[20] The Computer Price Guide lists prices

---

[19]Therefore, Hartmann determined the value of Hurchalla's, Thrall's, and Mukerji's equipment as of Nov. 25, 1980, Nov. 2, 1981, and Nov. 5, 1982, respectively.

[20]Hartmann described the lease premium in the following terms:

"There are a number of reasons why a buyer of leased and installed equipment might be willing to pay a lease premium, or an amount in excess of the value of the equipment itself. A buyer would usually recognize that the additional costs of delivery and installation of the equipment are included in the sale price, and thus justify a higher price. The buyer would also understand that the price includes an amount for finding the user and arranging documentation and financing. Finally, the existence of a lease carries with it the potential for additional revenue from lease renewals and/or lease continuations beyond the firm portion of the lease. Users have a tendency to continue to lease computer equipment that satisfies the user's needs

for used equipment which is not on lease. Hartman testified that equipment which is actually on lease, however, acquires an additional element of value attributable to the fact that the equipment is in place and has the potential for additional leasing revenue from existing users beyond the firm portion of the lease.

According to Hartmann's best estimate, the lease premium for a portfolio of installed equipment on lease is an amount in the range of 5 percent to 15 percent over the market value of comparable equipment sold on the used market and not installed on a lessee's premises. Since the leases in question were being administered by Comdisco, a successful remarketer of used IBM computer equipment, Hartmann believed that an investor would be reasonable to assume that the potential for additional lease revenue, and the lease premium, would be maximized in these transactions.

Respondent's witness on the issue of fair market value was Dee Morgan (herein Morgan). Since 1943, Morgan has been employed by several corporations, including IBM and Burroughs Corp., and she has served as the director of the computer center at the University of Utah and at Dugway Proving Ground in Utah. From 1965 through 1983, Morgan was employed by the General Services Administration as a computer equipment analyst and a data processing systems coordinator. During her period of employment at the General Services Administration, part of Morgan's responsibility involved providing estimates of the residual value and economic life of computer equipment to the Defense Contract Audit Agency. Morgan retired from this position in 1983 at a grade level of GS-13.

Morgan based her opinion of the fair market value of each petitioner's equipment on the values contained in the Computer Price Guide. Morgan's opinions and testimony differed, however, in several respects from Hartmann's.

---

rather than to purchase or lease new computer equipment. In making this decision to continue to lease existing equipment, the user normally will take into account the cost and inconvenience of changing the equipment. The user's costs of purchasing or leasing new computer equipment include training personnel on new equipment and in new procedures, as well as removal and installation costs. Thus, installed computer equipment normally can be expected to produce revenue at the end of its lease either because of purchase or renewal by the user, even though the same equipment offered for sale or lease on the market would not result in a realization of the same amount of rental or sales income."

First, Morgan gave her opinion of the fair market value of each petitioner's equipment as of December 31 of the year in which each transaction took place. Thus, Morgan based her opinion on the values set forth in the issues of the Computer Price Guide which were published in January following each transaction. On December 15, 1982, IBM announced a price cut in the 3880-1 storage control unit. Such price cut was reflected in the January issue of the Blue Book and was thus taken into account by Morgan in her determination of the value of 3880-1 storage control units as of December 31, 1982. Morgan used the January issue of the Computer Price Guide on the assumption that it would provide the most accurate prices as of December 31 of each year in issue, a date subsequent to the date of each private placement memorandum and the date each petitioner entered into the respective transactions.

The second area in which Morgan's analysis differs from that of Hartmann concerns the treatment of the prices set forth in the Computer Price Guide. Morgan claimed that the prices in the Computer Price Guide are "asking" prices and that actual trades take place at lower prices.[21]

Finally, Morgan did not apply a "lease premium" to the prices shown in the Computer Price Guide to ascertain the fair market value of the equipment purchased by petitioners.

The opinions of Hartmann and Morgan as to the fair market value of each petitioner's equipment, and the price each petitioner actually paid for his equipment, are set forth in the table below:

| | Fair market value | | | | |
| | Hartmann | | | | |
| | Value without lease premium | Value with 5% lease premium | Value with 15% lease premium | Morgan | Purchase price |
|---|---|---|---|---|---|
| Mukerji | $146,971 | $154,320 | $169,017 | $115,500 | $150,000 |
| Hurchalla | 202,250 | 212,363 | 232,588 | 219,000 | 198,400 |
| Thrall | 405,499 | 425,774 | 466,324 | 337,940 | 400,000 |

---

[21]Morgan used a factor ranging from 2 percent to 25 percent to discount the prices listed in the Computer Price Guide. On some items of equipment, she did not apply any discount factor.

Hartmann concluded that each petitioner paid a price at the low end of the fair market value range for his equipment. Morgan, however, concluded that Hurchalla paid a price below the fair market value of his equipment and that Thrall and Mukerji paid an amount in excess of the fair market value of their equipment.

## Expert Testimony on Residual Value

Frederic G. Withington (herein Withington) and Esmond C. Lyons, Jr. (herein Lyons), testified for petitioners with respect to the residual value of the equipment which might reasonably be anticipated at the conclusion of each petitioner's lease with Comdisco.[22]

Withington is a vice president of Arthur D. Little, Inc., a Cambridge, Massachusetts, consulting firm. Withington is a specialist in the computer and information processing industry and has been a visiting professor at the Harvard Business School, where he lectured on advanced information processing systems. He has written 4 books and 52 articles on information processing, which have been translated into 8 languages. In his position at Arthur D. Little, Inc., Withington has been involved in preparing residual value forecasts of IBM equipment for over 20 years. Since 1964, he has also been responsible for a series of widely disseminated annual reports assessing and forecasting developments in the computer and data processing industries. The technology forecasts which Withington relied on at the trial of the instant case had been prepared at the request of both manufacturers and large customers of computer equipment, including the Federal Government.

In preparing a residual value forecast for IBM equipment, Withington takes into consideration the following factors:
—IBM's probable future successor products
—Future user requirements
—Future of the relevant technology
—IBM's worldwide business interests

In preparing his expert witness report which was introduced at trial, Withington relied solely upon forecasts which

---

[22]In addition, Hartmann expressed his general views as to the economic life of the 3350 disk drive and the 3880 storage control unit. He did not, however, predict specific residual values for any of the equipment involved.

he had prepared at the time each of the three transactions at issue took place. In November of 1980, Withington had prepared a technology forecast entitled "Future Information Processing Technology" which was submitted at the request of the Defense Intelligence Agency. This report included a forecast of the specific cost of disk drive technology for the period from 1980 through 1995. Since this report was prepared in November of 1980, at approximately the same time Hurchalla purchased his equipment, it represents Withington's opinion of the future value of Hurchalla's equipment as of the date Hurchalla purchased his equipment.

Withington used a similar method in expressing his opinion as to the residual value of Thrall's equipment. In November of 1981, Withington had prepared another technology forecast entitled "Future Information Processing Technology" which was submitted at the request of the Defense Intelligence Agency. This report also included a forecast of the specific cost of disk drive technology for the period 1981 through 1995. Since this report was prepared at approximately the same time Thrall purchased his equipment, Withington used this report to indicate his opinion in November 1981, concerning the future value of Thrall's disk drive equipment.

Thrall also purchased a small amount of data entry and display terminal equipment, and Withington's November 1981 report provided a projection of the future value of such equipment. Withington used this report to indicate his opinion in November 1981 concerning the future value of Thrall's terminal equipment.

Withington used two different reports to estimate the residual value of Mukerji's 3880 storage control unit. First, Withington referred to a specific residual value forecast for the 3880-1 storage control unit which he had prepared in June of 1983, 6 months after Mukerji purchased his equipment. This report was prepared for St. Joseph Equity Corp., a leasing company. In this forecast, Withington predicted that the 3880-1 storage control units owned by Mukerji would be worth $20,572 at the end of 1989 (14 percent of Mukerji's purchase price).

Since the report for the St. Joseph Equity Corp. was prepared 6 months after Mukerji's transaction, Withington used a second report to verify his estimate. In August of 1982, Withington had prepared another technology forecast which was a portion of a report entitled "Future Information Processing Technology" which was submitted at the request of the Institute for Computer Science and Technology in the National Bureau of Standards.[23] In this report, Withington prepared a forecast of disk drive technology which indicated that the value of disk drives at the end of 1989 would be equal to 12.5 percent of their August 1982 value. Since storage control units decline in value in proportion to the disk drives they control, based on this study Withington would have predicted that Mukerji's equipment would have been worth $18,500 at the end of 1989 (12.5 percent of Mukerji's purchase price).[24]

Therefore, as of December 1982, Withington testified that he would have projected a residual value of either $20,572 or $18,500 for Mukerji's equipment, with the former projection more likely since it was a specific forecast for the 3880-1 storage control unit.

Petitioner's remaining expert witness, Lyons, is the principal management consultant in the information systems division of SRI International (herein SRI), formerly known as the Stanford Research Institute. SRI is a not-for-profit corporation which is involved in technology research and management consulting for business and Government clients.

Lyons received a Bachelor of Science degree in physics and mathematics from the University of Maryland, where he was involved in programming the Univac I, the world's first commercial computer. In his position at SRI, Lyons has been responsible for providing consulting services to computer manufacturers and service companies. These consulting services include market research for planned or existing products, technology forecasts, and the development of marketing plans. The clients of SRI in this area include major computer equipment manufacturers. Due to the

[23]This report was developed jointly for the Institute for Computer Science and Technology and the Defense Intelligence Agency.

[24]This report was developed jointly for the Institute for Computer Science and Technology and the Defense Intelligence Agency.

nature of Lyons' employment, it has been essential for him to be fully aware of IBM's technical capabilities and marketing activities.

The method which Lyons used to make his predictions of residual value consisted of several steps. First, he analyzed the historical performance of similar equipment as of the time each transaction took place. Second, he reviewed current developments in computer technology, as of the time each transaction took place, and in doing so used an extensive data base maintained by SRI relative to residual values. Third, he made certain assumptions about future market conditions, again as of the time each transaction took place. In making the residual value projections he presented in these cases, Lyons relied upon the following facts and assumptions:

—The 3350 disk drive consistently sold at higher used prices at a comparable age than any predecessor disk drive product.

—Disk drive technology was approaching certain limitations which would result in more stable prices for used disk drives.

—Storage control units, such as the 3880 storage control unit, generally have used values much higher than other computer products.

Hartmann did not provide specific predictions of residual value, but he did offer general observations about the economic life of the 3350 disk drive and the 3880 storage control unit. Because of the popularity and high demand for the 3350 disk drive throughout 1980 and 1981, Hartmann testified that it would have been reasonable to assume that the 3350 disk drive would produce rental income through 1990 and beyond. Since the 3880 storage control unit can be upgraded for use with the new 3380 disk drive, Hartmann stated that the 3880 storage control unit would likely have an economic useful life of several years beyond that of the 3350 disk drive.

Morgan testified for respondent concerning her opinion as to the residual value of each petitioner's equipment. Her residual value projections were much lower than those provided by petitioners' witnesses. Morgan's method of projecting residual values is to examine the history of

similar types of equipment on the assumption that current models will follow the economic performance of past models. In analyzing the residual value of the 3350 disk drives purchased by Thrall and Hurchalla, Morgan based her analysis on the assumption that no prior disk drive product ever had an economic life of longer than 14 years. Therefore, Morgan concluded that 3350 disk drives would be worthless by the end of 1989. For these reasons, Morgan testified that the residual values of the 3350 disk drives purchased by Hurchalla and Thrall would be minimal.

Furthermore, Morgan testifed that a major factor in the residual value of disk drive devices was intense competition from "plug-compatible manufacturers." A plug-compatible manufacturer produces equipment, such as disk drives, which will function with IBM components and software. Morgan testified that the competition of plug-compatible manufacturers, such as Storage Technology, Memorex, ITEL, Telex, and Control Data Corp., were driving down the value of disk drive devices. However, at the time of trial, three of these five plug-compatible manufacturers had filed for bankruptcy or withdrawn from the disk drive market.

As to the 3880-1 storage control unit purchased by Mukerji, Morgan testifed that its value would be dependent upon the economic lives of the disk drives which it is able to control. Although she testified that the 3880-1 storage control unit disk drive can be used with a wide variety of disk drives, her expert witness report and her testimony did not reflect that the 3880-1 storage control unit can be easily upgraded for use with the new 3380 disk drive. Morgan stated in her report that the 3880-1 storage control unit can be expected to have a value "as long as the newest of [the disk drives], the 3375 Disk Drive which was first installed in 1981." Morgan stated that the 3375 disk drive was installed in 1981 but probably would not have any value by the start of 1990. Morgan's report stated that Mukerji's equipment, consisting of 3880-1 storage control units and a 3340-A2 disk drive, would be worthless at the end of 1989, when the term of the lease between Mukerji and Comdisco expires.

Morgan also testified that Thrall's terminal equipment would have no possible residual value.

The conclusions of each expert witness as to the residual value of each petitioner's equipment are set forth below. In addition, the residual value predicted in the appraisal letters included in each private placement memorandum are also indicated.[25]

|  | Withington | Lyons | Morgan | Appraisal letter |
|---|---|---|---|---|
| Mukerji[26] | $18,500-$20,572 | $35,000-$46,000 | 0 | $15,000 |
| Hurchalla | 71,845 | 30,000- 50,000 | 7,600 | 39,680 |
| Thrall | 65,476 | 50,000- 81,000 | 4,000 | 80,000 |

None of the experts who testified at the trial gave a specific projection of the amount of cash-flow Mukerji could expect as "additional rent" during the period of 1987 to 1989 pursuant to the terms of his lease with Comdisco. Each of petitioners' experts, however, indicated that the 3880-1 storage control units owned by Mukerji will continue to have substantial rental value throughout the term of Mukerji's lease with Comdisco.

During the calendar year 1985, the sublessees of the two 3880-1 storage control units owned by Mukerji paid Comdisco $47,016 in rental income. These units were being subleased by Comdisco to two sublessee end-users at the time of trial. The 3340-A2 disk drive owned by Mukerji was not subleased by Comdisco to any sublessee during 1985 and at the time of trial.

The record shows that during the calendar year 1985, the sublessees of the equipment owned by Hurchalla paid Comdisco $22,014 in rental income. All of Hurchalla's equipment was subleased by Comdisco to end-users for part or all of 1985, and at the time of trial, all of Hurchalla's equipment except the 3350-A2 disk drive was on lease to a sublessee end-user.

During the calendar year 1985, the sublessees of the equipment owned by Thrall paid Comdisco $25,440 in rental income. For part or all of 1985, all of the 3350 disk drives

---

[25] As discussed above, the appraisal letters in Hurchalla's and Thrall's transactions were prepared by Richard Forsythe of Forsythe/McArthur Associates, Inc. The appraisal letter in Mukerji's transaction was prepared by Kenneth Steinback of Computer Sales International, Inc.

[26] As discussed above, Withington testified that $20,572 was the more likely projection.

owned by Thrall were subleased by Comdisco to end-users and all were similarly subleased at the time of trial. Five of the 3277-2 display stations owned by Thrall were subleased by Comdisco to end-users in 1985. The remaining items of terminal equipment, which represent 4.3 percent of Thrall's purchase price, were not subleased by Comdisco in 1985 or at the time of trial.

### Petitioners' Rebuttal Testimony

Walter Papciak and Richard Paulsen testified for petitioners as rebuttal witnesses to establish the market condition of the various equipment at issue.

Walter Papciak (herein Papciak) is a vice president of Computer Intelligence Corp. Computer Intelligence Corp. is in the business of collecting marketing information concerning the users of various types of computer equipment. In the course of its business, Computer Intelligence Corp. conducts surveys to determine the amount of installed IBM peripheral equipment throughout the United States. This information is provided to clients for their use in understanding the computer market in the United States. In addition, Richard Paulsen (herein Paulsen), Comdisco's vice president in charge of data processing services, testified concerning the records which Comdisco maintains of its equipment on lease.[27] Paulsen produced summaries of Comdisco's records which analyzed the amounts of various items of equipment which Comdisco currently has on lease. The testimony of Papciak and Paulsen indicates that disk drive devices which Morgan claims are already worthless or will soon be worthless are still in demand.

Contrary to Morgan's statement that the 3340 disk drive, one of the pieces of equipment purchased by Mukerji, became worthless in 1985, petitioners' rebuttal testimony and exhibits show that thousands of these units were still in use at the time of trial, both by the public and the private sector. As of the date of trial, Comdisco continues to lease these items under noncancelable leases which extended through 1990.

---

[27]Pursuant to sec. 7461(b)(1), petitioners' exhibits numbered 76 through 83 and portions of Paulsen's testimony relating to such exhibits have been placed under seal by order of the Court due to trade secrets contained therein.

Similarly, the record showed a strong market for 3350 disk drives purchased by Thrall and Hurchalla. Comdisco is currently entering into leases for these units through 1991 and has more 3350 disk drives on lease than new 3380 disk drives. Petitioners also produced evidence from Computer Intelligence Corp. which indicated that among IBM equipment users, the 3350 disk drive continues to remain in use in quantity roughly equal to the new 3380 disk drives. Furthermore, the record shows that both of the 3350-C2 disk drives at issue in this case are currently on lease and are producing income.[28]

## ULTIMATE FINDINGS OF FACT

The purchase price in each transaction herein is approximately equal to or below the fair market value of the property. The residual value projection of the equipment as set forth in the respective private placement memorandum is reasonable, and petitioners could reasonably expect a profit.[29]

## OPINION

The instant consolidated cases serve as test cases for hundreds of other investors in the programs discussed above.

The principal issue in the instant cases is whether petitioners should be viewed for tax purposes as the owners of the equipment in each respective transaction. Petitioners contend that each of the three transactions at issue involved a significant and realistic possibility of economic profit, and that the form of these transactions therefore must be respected for tax purposes. Respondent claims that the transactions at issue lack economic substance and that petitioners did not invest in these transactions with the requisite profit motive. Respondent contends that the three

---

[28]Thrall owns two 3350-C2 disk drives. These units were being subleased by Comdisco to end-users as of the trial and produced $4,800 of rental income from subleases in 1985.

[29]Neither party has raised or presented the issue as to whether fees or interest should be considered in determining whether petitioners could realize a profit. Nevertheless, we believe that the residual value plus the cash flow to be generated from the transactions by the end of the lease terms is such that petitioners would realize a profit. See *Hilton v. Commissioner*, 74 T.C. 305 (1980), affd. per curiam 671 F.2d 316 (9th Cir. 1982), cert. denied 459 U.S. 907 (1982); compare *James v. Commissioner*, 87 T.C. 905 (1986).

transactions were merely tax-avoidance schemes in which petitioners acquired nothing more than a nondepreciable future interest in the computer equipment.[30] In short, respondent argues that the transactions herein are shams entered into solely for the purpose of tax reduction.

Generally, the form of a leasing transaction should be respected so long as the lessor retains significant and genuine attributes of a traditional lessor. *Frank Lyon Co. v. United States*, 435 U.S. 561, 585 (1978); *Estate of Thomas v. Commissioner*, 84 T.C. 412, 432 (1985). "We cannot ignore the reality that the tax laws affect the shape of nearly every business." *Frank Lyon Co. v. United States, supra* at 580. Therefore, the existence of tax benefits accruing to an investor does not necessarily deprive a transaction of economic substance. *Frank Lyon Co. v. United States, supra* at 581; *Packard v. Commissioner*, 85 T.C. 397, 417 (1985); *Estate of Thomas v. Commissioner, supra* at 432. When, however, a transaction has no economic purpose other than to obtain favorable tax consequences, the form of the transaction will be disregarded by the Court. *Estate of Thomas v. Commissioner, supra*, and the cases cited therein; *Rice's Toyota World, Inc. v. Commissioner*, 81 T.C. 184, 195 (1983), affd. on this issue 752 F.2d 89 (4th Cir. 1985); *Grodt & McKay Realty, Inc. v. Commissioner*, 77 T.C. 1221, 1243, 1244 (1981). The Supreme Court in *Frank Lyon* was presented with a sale-leaseback transaction. This Court has also recently decided three cases involving computer equipment leasing transactions. *Rice's Toyota World, Inc. v. Commissioner, supra*; *Estate of Thomas v. Commissioner, supra*; *Coleman v. Commissioner*, 87 T.C. 178 (1986). We will briefly discuss the facts and holdings of each case before turning to the instant cases.

In *Frank Lyon*, the Supreme Court dealt with the problem of allocating depreciation deductions in a sale-leaseback transaction and held that the form of the transaction should be respected. There, Worthen Bank, which was prohibited by State and Federal regulations from financing the construction of a new bank building through

---

[30]In the notices of deficiency for two of the cases herein, respondent raised sec. 465 as one of the grounds for the disallowance of deductions. Respondent chose not to pursue the issue of the application of sec. 465 throughout the trial of these cases and subsequently made an express concession thereof. Accordingly, we need not address that issue here.

conventional methods, sold the bank building to Frank Lyon Co. for a total of $7,640,000, and then leased it back. Frank Lyon Co. put $500,000 down and financed the remaining sum from a third-party lender. The loan was secured by a 25-year mortgage, an assignment of the ground and building lease, Frank Lyon Co.'s promise to assume personal responsibility for the loan's repayment, plus a promise that the building lease would extend through the duration of the 25-year mortgage at a rental amount at least equal to the monthly mortgage payments.

The building lease ran for a primary term of 25 years. During this time, Worthen Bank retained options to repurchase the building at the end of the 11th, 15th, 20th, and 25th year for amounts equal to the then-outstanding mortgage plus Frank Lyon Co.'s initial $500,000 downpayment with 6-percent compounded interest. Alternatively, Worthen Bank could opt to renew the lease for eight additional 5-year terms. Rental payments during the first 25 years were exactly equal to the mortgage payments. This was a net lease, Worthen Bank remaining obligated at all times to maintain the building, to pay all taxes and utility charges, and to buy insurance.

The Commissioner disallowed Frank Lyon Co.'s claimed depreciation and interest deductions and determined that Frank Lyon Co. was not really the owner of the building for tax purposes and the transaction was merely a two-party financing arrangement.

The Supreme Court found that Frank Lyon Co. was indeed the owner of the property for tax purposes. The test in *Frank Lyon* is that in a sale-leaseback context, a nonuser-owner recipient of tax benefits must prove that his entry into the transaction was motivated by a business purpose sufficient to justify the form of the transaction, and that the underlying transaction was supported by economic substance.[31]

In *Rice's Toyota*, we set forth the test whereby a transaction should be disregarded for Federal income tax purposes. Under such test, the Court must find "that the taxpayer was motivated by no business purpose other than

---

[31]*Rice's Toyota World, Inc. v. Commissioner*, 81 T.C. 184, 201-202 (1983), affd. on this issue 752 F.2d 89 (4th Cir. 1985).

obtaining tax benefits in entering the transaction, and that
the transaction has no economic substance because no
reasonable possibility of a profit exists." *Rice's Toyota
World, Inc. v. Commissioner*, 752 F.2d at 91, citing *Rice's
Toyota World, Inc. v. Commissioner*, 81 T.C. at 209 (1983).

Once business purpose is established, the transaction should not be
classified a "sham." A finding of no business purpose, however, is not
conclusive evidence of a sham transaction. The transaction will still be
valid if it possesses some modicum of economic substance.

Conversely, transactions devoid of economic substance are not always
shams such as where a taxpayer mistakenly believes there existed a
potential for profit. But when there is a finding that the taxpayer entered
into the transaction for tax reasons only, then it is proper to subject the
transaction to an objective economic analysis to determine whether there
could have been an opportunity for profit.

[81 T.C. at 203 n. 17; citation ommitted.]

To make the determinations of whether a realistic oppor-
tunity for economic profit exists to justify the form of the
transaction, the Court must probe beneath the labels given
by the parties and view the transaction in the context of its
surrounding facts and circumstances. *Rice's Toyota World,
Inc. v. Commissioner, supra* at 203.

In *Rice's Toyota*, taxpayer purchased computer equip-
ment and leased back such equipment to the seller. The
seller then simultaneously subleased such equipment to a
third party. The purchase price of $1,455,227 was paid by
taxpayer in the form of a promissory note in the amount of
$250,000 and two nonrecourse notes. Although an annual
cash-flow appeared to be guaranteed, the fine print of the
lease revealed that the rent payments were to be satisfied
solely out of proceeds of the sublease. The term of the
sublease expired 3 years before the expiration of the term of
the nonrecourse notes executed by taxpayer.

In *Rice's Toyota*, we first tested the transaction for
business purpose and found that there was little, apart from
tax considerations, to justify taxpayer's entry into the
transaction. We found that taxpayer's president and sole
shareholder deviated from his usual practice in investigat-
ing the transaction and mainly discussed the tax benefits
arising from the transaction. He "made no effort to
determine whether [taxpayer] was purchasing an obsolete
computer or one that would have a high residual value." 81

T.C. at 202. The only evidence of residual value reviewed by taxpayer's president in *Rice's Toyota* was a Stanford Research Institute report which indicated that taxpayer could not possibly make a profit on its investment. 81 T.C. at 191. Despite the low values predicted in the Stanford Research Institute report, and contrary to its accountant's advice that the residual value of the equipment was important, taxpayer did not seek any independent appraisal of the equipment's residual value. On that evidence, we held that the record showed taxpayer did not evaluate the transaction on an economic basis but was concerned only with tax benefits. Thus, we found that the action of taxpayer in *Rice's Toyota* lacked the requisite subjective business purpose.

In *Rice's Toyota*, after we determined that taxpayer did not enter the transaction therein with a non-tax related business purpose, we tested the transaction for economic substance to determine whether a realistic opportunity for economic profit justified the form of the transaction. Taxpayer's entitlement to only 70 percent of the residual value of the property coupled with the low residual value as established by the most credible projection led us to conclude that taxpayer would not even recover its initial investment. We therefore held that taxpayer would realize no economic value and the transaction had no economic substance.

*Estate of Thomas v. Commissioner*, 84 T.C. 412 (1985), also involved a computer equipment leasing transaction. In that case, taxpayers who were limited partners in a partnership claimed various deductions in connection with computer equipment leasing activities engaged in by the partnership. The purchase price for the computer equipment was paid with $945,673 of cash and $8,124,561 of nonrecourse debt. We found that the partnership, not the lessee, was the true owner of the computer equipment for tax purposes since taxpayers retained a significant benefit and burden of ownership with respect to the equipment—that the residual value would either generate a profit or a loss. 84 T.C. at 434. Furthermore, we found that the reasonably expected residual value of the equipment was

more than sufficient to provide a profit to the taxpayers. 84 T.C. at 433.

In *Estate of Thomas*, we summarized the test set forth in *Rice's Toyota* as one which requires the transaction to either meet the subjective "business purpose" test, or a more objective "economic substance" test and we found that there was economic substance in the transaction. 84 T.C. at 439. The parties there stipulated that the equipment was expected to have a useful life of at least 3 years beyond the lease terms. Furthermore, the parties stipulated that a residual value of 14 percent, which would have enabled the partnership-lessor to recoup its original cash investment and to break even, was reasonably expected. We also found that the record supported a reasonable potential for considerably higher residual values.

In *Estate of Thomas*, we found certain factors to be only neutral in determining the presence of economic substance. We observed that net leases are commonly used and do not necessarily reflect an absence of ownership. 84 T.C. at 433. We held that the absence of significant positive cash-flow during the lease term is a neutral factor. Furthermore, we held that the calculation of rental amount "geared to the cost of interest and mortgage amortization is not, in and of itself, much more than a neutral commercial reality." 84 T.C. at 436. We also held that since nonrecourse liabilities are commonly used in modern transactions, the nonrecourse nature of notes is not necessarily more than a neutral factor. 84 T.C. at 436.

We found the facts in *Estate of Thomas* almost indistinguishable from those of *Frank Lyon Co. v. United States*, 435 U.S. 561, 585 (1978), wherein the investor had made only a 6-percent equity investment in the property involved. In *Estate of Thomas*, taxpayers made a 13-percent equity investment. We held that such substantial equity in the property was indicative of traditional lessor attributes and served to lend substance to the transaction. 84 T.C. at 436. We noted that while the transaction did involve some tax savings in the early years, "its economics" were such that those tax savings would be reduced in later years as the investment encountered a "turn around" after which the investors would be required to pay taxes. As a result, we

found that the net tax savings from the investment were considerably less than taxpayer's cash investment which indicated that the transaction was not motivated solely by tax benefits.

In *Coleman v. Commissioner*, 87 T.C. 178 (1986), we found that taxpayer did not have a depreciable interest in property acquired through a chain of transactions. In *Coleman*, taxpayer was a partner in a partnership which acquired an interest in computer equipment from a supplier of computer equipment through several intermediary parties. Such supplier had previously transferred to certain parties (herein lenders) title to computer equipment and arranged for leases of the equipment between the lenders and the supplier's customers. In return therefor, such equipment supplier received an amount based upon the discounted value of the stream of rents receivable under the leases so arranged. The equipment supplier also entered into "residual agreements" with the lenders whereby such supplier would retain options to repurchase the equipment for nominal consideration upon expiration of the leases' initial terms. It was this interest under the residual agreement which the partnership acquired. Upon acquiring the interest in the equipment, the partnership then leased back such interest to its immediate seller.

Respondent argued that the lenders, not the equipment supplier, were the owners of the equipment and, as such, the partnership, as successor in interest to the equipment supplier, had no depreciable interest in the property. Taxpayer in *Coleman* found himself in the unusual position of arguing that the form of the transaction should be disregarded, that the equipment supplier was the owner of the equipment and thus the owner of the depreciable interest.

We found for respondent in *Coleman*. Noting that taxpayers have less freedom than the Commissioner to disavow the form of a transaction, we held that the taxpayer in *Coleman* had the burden of proving *at a minimum* "strong proof" that he had acquired a depreciable interest in the equipment. In *Coleman*, we distinguished *Frank Lyon Co. v United States*, 435 U.S. 561 (1978), and *Estate of Thomas v. Commissioner*, 84 T.C. 412 (1985), in at least that regard.

With the foregoing considerations, we now turn to the cases at bar.

### Objective Economic Substance

We first address petitioners' argument that the transactions herein involved a significant and realistic possibility of economic profit. To be respected for tax purposes, business transactions must meet a minimum threshold of a business purpose or economic objective. *Rice's Toyota World, Inc. v. Commissioner, supra* at 209. As we discussed above, the inquiry as to economic substance is whether a realistic opportunity for economic profit exists to justify the form of the transaction. *Rice's Toyota World, Inc. v. Commissioner, supra* at 203.

We find that petitioners paid an amount approximately equal to or below fair market value for the equipment. Since respondent's expert produced a higher value for Hurchalla's equipment than the purchase price, the only conflict between the parties on the factor of fair market value is with respect to Thrall's equipment and Mukerji's equipment where respondent's expert testified that the respective purchase prices exceed the fair market values of the equipment. Petitioners' experts and respondent's expert all relied on the Computer Price Guide in arriving at the fair market value of the computer equipment at the time the respective transactions were entered. One difference between the techniques employed by petitioners' experts and those by respondent's expert on the issue of fair market value was the time at which such fair market value should be determined. We find the figures presented by petitioners' experts more credible than those of respondent's expert. In making the calculation of fair market value, Morgan, respondent's expert witness, used the issue of the Computer Price Guide from January of each year. The record shows, however, that such issue of the Computer Price Guide was not available to the public until the beginning of January following each transaction, at the earliest. Therefore, such publication was not available to any of petitioners herein at the time they entered into their respective transactions. Furthermore, Morgan gave her evaluation of fair market values of the equipment as of December 31 of each relevant

year, which in each case was a date after the date of each private placement memorandum and a date after each petitioner entered into the transaction and made the initial payment of his investment.

Furthermore, we note that on December 15, 1982, IBM announced a price cut in the 3880-1 storage control unit. Morgan took this price cut into account in determining the equipment's value as of December 31. We find it inappropriate to take into account a price change which took place after Mukerji purchased his equipment in determining the fair market value of Mukerji's equipment at the time he made his purchase.

Petitioners' expert witness, Hartmann, who testified with respect to the fair market value of the equipment here in issue, consulted the October issue (as well as the January issue) of the Computer Price Guide of the respective years. We find that the figures and information as available in the October issue of the Computer Price Guide were those which were available to the public at the time the transactions herein were entered into. Furthermore, we find Hartmann's analysis of a lease premium reasonable. Based on Hartmann's analysis, each petitioner herein purchased the computer equipment for an amount below or approximately equal to the fair market value of the equipment. We are satisfied that at the time of petitioners' entry into the transactions, the purchase price for the equipment at issue was below or approximately equal to its fair market value.

The record demonstrates that with respect to residual values, the forecasting techniques employed by the petitioners' experts were more credible and reasonable than those of respondent's expert, and we find that each petitioner could reasonably realize an economic profit through his investment. First, we note that no business can operate on the basis of hindsight. Estate of Thomas v. Commissioner, supra at 428-430. Any business operation involves the risk that a loss, as well as a profit, may result. We therefore analyze the foreseeable residual value of the equipment at the time the transactions were entered into.

We first examine respondent's projections. Morgan, respondent's expert witness, based her residual value testimony on the premise that historically no disk drive ever

had an economic life beyond 14 years. Morgan was not an expert in disk drive technology, and she made no technology forecasts during the years at issue. The extent of her exposure to technology was through the news media. Furthermore, petitioners effectively showed that the declining speed of technological change could prolong the economic life of peripheral computer equipment, such as disk drives. In light of her lack of specialized knowledge, we find Morgan's position on the economic life of the residual value disk drives unreliable.

Furthermore, we find respondent's objections to the residual value projection contained in the private placement memoranda and those made by petitioners' expert witnesses of the 3350 disk drive unpersuasive. Morgan claimed the high demand and prices being paid for the 3350 disk drive throughout 1981 were minor aberrations due to the delay in delivery and production of the new 3380 disk drive, a possible replacement for the 3350 disk drive. Yet, all four expert witnesses, including Morgan, agreed that IBM had encountered significant difficulties in producing the new 3380 disk drive throughout this period and these difficulties were not solved until well after Hurchalla and Thrall purchased their units. Furthermore, the record indicates that one of the plug-compatible manufacturers had encountered "insurmountable technical problems in developing a 3380" and had not since produced any disk drives as of the time of trial. Therefore, from the record, we do not believe that it was clear in 1980 and 1981 that IBM's significant difficulties in producing the new 3380 disk drive could be easily solved. We also find consumers' willingness to wait as long as 2 years for the delivery of the 3350 disk drive during the 1980-81 period an indication of the market strength of the 3350 disk drive at that time.

We find Morgan's statement that the "intense competition" of the plug-compatible manufacturers was continually forcing down the price of 3350's to be effectively rebutted at trial. We find that the record does not support Morgan's view that the plug-compatible manufacturers were a controlling force in lowering the residual value of the 3350 disk drive. That at the time of trial three of the five plug-compatible manufacturers she mentioned had filed for

bankruptcy or withdrawn from the disk drive market casts serious doubt on the strength of plug-compatible manufacturers in the competition with IBM. For these reasons, we find petitioners' expert witnesses' projections more reasonable.

We also find Morgan's view that the 3880 storage control units purchased by Mukerji would be worthless in 1989 not supported by the record. All four of the expert witnesses, including Morgan, agreed that the 3880 storage control unit retains its value in proportion to the disk drives it controls. Therefore, Morgan stated that the 3880 storage control unit would have an economic life as long as that of the 3375 disk drive, which was first installed in 1981. Morgan estimated that the 3375, and therefore the 3880, would be worthless by the end of 1989.[32] However, all the experts agreed that the 3880-1 storage control unit can be upgraded for use with the 3380 disk drive, IBM's latest disk drive, with relative ease and low cost. Furthermore, the experts all agree that upgrading the 3880-1 storage control unit would significantly enhance its residual value and possibly its useful life.

Having found the residual value projections of petitioners' expert witnesses more reliable, we note that the residual value projections in the private placement memoranda are within the range projected by Lyons and, with the exception of the equipment in the Thrall transaction, more conservative than the projections made by Withington. In view of the residual value of the equipment based on the credible projections made by petitioners' experts, the virtually guaranteed cash-flow in the transactions entered into by Thrall and Hurchalla and the high probability of additional rent in Mukerji's transaction, we find there is an opportunity for profit in each of the transactions.

The record shows that petitioners here, like taxpayers in *Estate of Thomas v. Commissioner*, 84 T.C. 412 (1985), retained the significant benefits and burdens of ownership with respect to the equipment. Petitioners' initial equity in each transaction exceeded that in the transaction in *Frank Lyon Co. v. United States*, 435 U.S. 561, 585 (1978) (6

---

[32]Morgan gave only a vague explanation of why the 3375 would have a useful life of only 8 years while other disk drives usually have useful lives of 14 years.

percent of the purchase price); and *Estate of Thomas v. Commissioner, supra* (13 percent). Mukerji's initial equity was 16.53 percent of the purchase price of the equipment; Hurchalla's initial equity was 22 percent; and Thrall's initial equity was 17.75 percent. Furthermore, we find here that the residual value of the equipment plus the cash-flow generated by the rental of the equipment in each transaction allows petitioners to at least recoup their initial cash investment. We also find that like the transaction in *Estate of Thomas*, the purchase price approximately equals or is less than the fair market value of the equipment in each transaction herein. Finally, petitioners here encounter a "turn around" point in the tax aspects of their transactions similar to that discussed in our opinion in *Estate of Thomas*. Although there were initial tax benefits, the amount of net tax savings in the transactions here is considerably lower than petitioners' out-of-pocket cash investments.

We hold that petitioners acquired and retained significant benefits and burdens of ownership with respect to the equipment.[33] We also hold that the transactions herein meet the threshold of economic objective required in *Rice's Toyota*, that the transactions herein have economic substance, and that therefore they should be respected for tax purposes.[34]

---

[33]We note that due to the burden on taxpayers in *Coleman v. Commissioner*, 87 T.C. 178 (1986), to present "strong proof," the instant case is distinguishable therefrom. Furthermore, in *Coleman*, although we held that identity of lease payments and debt payments under the nonrecourse notes in effect canceled each other and should be ignored in determining the nature of the interest in the property acquired by the taxpayers, we emphasized that recourse financing presents a different case. Since the debt financing herein is recourse to the extent of 68 to 100 percent, and there was almost complete certainty that the nonrecourse portion would be repaid, we find *Coleman* also distinguishable in this respect.

[34]Furthermore, we note that in *Rice's Toyota World, Inc. v. Commissioner*, 81 T.C. 184 (1983), affd. on this issue 752 F.2d 89 (4th Cir. 1985), we stated that a genuine indebtedness supported by an actual investment is strong evidence of economic substance. 81 T.C. at 202. Since we find that the notes executed in the transactions herein are recourse to the extent of 68 to 100 percent with substantial certainty of repayment with respect to the minor nonrecourse portion, the purchase price approximately equals or is less than the fair market value of the equipment in every transaction, and the residual value plus the cash-flow to be generated from the rental of the equipment is sufficient for petitioners to realize a profit, there exists in these transactions a genuine indebtedness supported by an actual investment. See *Knetsch v. United States*, 364 U.S. 361 (1960); *Estate of Franklin v. Commissioner*, 544 F.2d 1045 (9th Cir. 1976), affg. 64 T.C. 752 (1975); *Rice's Toyota World, Inc. v. Commissioner*, 81 T.C. 184 (1983); *Narver v. Commissioner*, 75 T.C. 53 (1980), affd. per curiam 670 F.2d 855 (9th Cir. 1982).

In addition to the foregoing, we also note that petitioners entered into the transactions herein for a business purpose and not solely for tax reasons. At trial, the Court was impressed

*Additions to Tax and the Application of Section 6621(d)*

We now address the issues of whether certain petitioners are liable for additions to tax pursuant to sections 6653(a)(1), 6653(a)(2), or 6659. Section 6653(a) in 1980 and section 6653(a)(1) in 1981 and 1982 provide for an addition to tax of 5 percent of any underpayment that is due to negligence or intentional disregard of rules and regulations. Section 6653(a)(2) in 1981 and 1982 provides for an addition to tax in an amount equal to 50 percent of the interest payable under section 6601 with respect to the portion of the underpayment due to negligence or intentional disregard of rules and regulations. Section 6659 provides for an addition to tax in an amount equal to a certain percentage of the underpayment attributable to a valuation overstatement. Sections 6653(a)(1), 6653(a)(2), and 6659 apply where there is an underpayment as defined in section 6653(c). Since we find herein that the transactions have economic substance and should be respected, there is no underpayment within the meaning of section 6653(c), and we hold therefore that petitioners are not liable for additions to tax under sections 6653(a)(1), 6653(a)(2), or 6659 with respect to the transactions at issue herein.[35]

Respondent raised in his amendment to answer the applicability of section 6621(d). Section 6621(d) provides that, in the event an underpayment exceeds $1,000 and is attributable to tax motivated transactions, the interest payable on such underpayment is 120 percent of the rate

by petitioners' credible testimony, and we are convinced that petitioners are prudent businessmen who entered into investments which they believed present a potential for profit. The record establishes that petitioners consistently scrutinized each investment they entered into with great care. We find that they followed this practice in entering into the transactions here.

[35]We do not decide here the application of secs. 6653(a)(1), 6653(a)(2), and 6659 with respect to the severed issue in docket No. 34124-84 involving petitioners Aditya B. Mukerji and Swati Mukerji. Furthermore, in docket No. 39312-84, petitioners Charles F. Hurchalla and Judith Hurchalla had conceded the remaining Federal income tax adjustments raised by respondent in the notice of deficiency and had failed to introduce evidence to overcome respondent's determination of negligence under sec. 6653(a)(1) for 1980 and sec. 6653(a)(1) for 1981 with respect to such conceded items. Rule 142. We therefore sustain the addition to tax under sec. 6653(a)(1) with respect to the amount of deficiency attributable to the conceded items. Rule 149. Respondent also determined an addition to tax under sec. 6653(a)(2) for 1981 with respect to an issue which was conceded by petitioners Charles F. and Judith Hurchalla. As petitioners introduced no evidence in that regard, they have failed to carry their burden of proof, and we accordingly sustain respondent's determination of additions to tax under sec. 6653(a)(2) with respect to such conceded item. Rules 142, 149.

established under section 6621(b). In light of our findings herein, we hold there is no underpayment which is attributable to tax motivated transactions and that section 6621(d) does not apply with respect to the transactions at issue herein.

To reflect the foregoing,

*Decisions will be entered under Rule 155.*

Reviewed by the Court.

STERRETT, GOFFE, CHABOT, NIMS, WHITAKER, KÖRNER, SHIELDS, HAMBLEN, CLAPP, SWIFT, JACOBS, GERBER, and PARR, *JJ.*, agree with this opinion.

PARKER, COHEN, WRIGHT, and WILLIAMS, *JJ.*, agree with the result only.

SIMPSON and WELLS, *JJ.*, did not participate in the consideration of this opinion.