HARVEY L. CASEBEER AND PATRICIA CASEBEER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Casebeer v. Commissioner
Docket No. 32928-83.
United States Tax Court
T.C. Memo 1987-628; 1987 Tax Ct. Memo LEXIS 673; 54 T.C.M. (CCH) 1432; T.C.M. (RIA) 87628; December 30, 1987. Thomas F. Topel, Kenneth L. Cutler, J. Marquis Eastwood, and Maureen H. Parkinson, for the petitioners. Randy G. Durfee and Joel A. Lopata, for the respondent. HAMBLEN
MEMORANDUM FINDINGS OF FACT AND OPINION HAMBELN, Judge: Respondent determined deficiencies in petitioners' [1] Federal income tax as follows: Year
Deficiency
1978
$ 11,939.00
1979
14,433.00
1980
8,546.00
The primary issues for our determination are whether the ownership interest acquired by petitioner in a sale and leaseback transaction was supported by economic substance and whether petitioner acquired the benefits and burdens of any such ownership. Subsidiary issues for our determination are (1) whether the ownership interest acquired, if any, was a present depreciable interest; (2) whether petitioner was at risk for certain *675 borrowed amounts pursuant to section 465; [2] (3) whether petitioner was entitled to depreciate certain computer equipment pursuant to the half-year convention method of depreciation in the taxable year 1978; and, (4) whether petitioner is liable for additional interest pursuant to section 6621(c). [3]
FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioners resided in the State of Montana at the time their petition herein was filed. Petitioner is a physician licensed to practice Medicine and Surgery in the State of Montana. Petitioner has specialized his practice in opthalmology. During the taxable years 1978 and 1979, petitioner *676 was a self-employed ophthalmologist conducting business in the name of Casebeer Eye Clinic. Petitioner's investment experience is primarily limited to the purchase and rental of apartment and commercial buildings used in the medical profession. In a transaction that is the subject of this case, petitioner purchased from Finalco, Incorporated ("Finalco") certain used peripheral computer equipment [4] manufactured by International Business Machines Corporation ("IBM") and, in a simultaneous transaction, leased such equipment back to Finalco. [5]
*677 Finalco
Finalco is the principal subsidiary of Finalco Group, Inc., formerly Financial Analytics Corporation, a publicly-held corporation, the stock of which is traded over-the-counter and reported in NASDAQ quotations. The principal offices of Finalco and Finalco Group, Inc., are located in McLean, Virginia. During the years in issue, Finalco was a closely held company. During the years in issue, Finalco typically engaged in leasing transactions involving electronic data processing equipment in which Finalco negotiated and entered into a lease with an end-user, purchased the equipment, financed the purchase with a lending institution, and resold the equipment in a sale and leaseback transaction with an independent third party. The resale of the equipment provided Finalco with much of the capital necessary to generate additional lease transactions. In addition to generating transactions through its own marketing programs, Finalco also acquired equipment subject to existing end-user leases from other leasing companies. During its fiscal year ending June 30, 1979, Finalco entered into lease transactions of approximately $ 129,000,000 based on the original cost of equipment. *678 John Olmstead ("Olmstead") served as president of Finalco during the years in issue. Acquisition of Equipment by Finalco
By a Purchase Agreement (the "Comdisco Purchase Agreement") with a closing date of September 29, 1978, Finalco acquired certain used IBM computer equipment from Comdisco, Inc. ("Comdisco"), through Bluewood Corporation ("Bluewood"), a Finalco subsidiary formed for the purpose of purchasing computer equipment for Finalco. Included as a portion of the Comdisco Purchase Agreement were certain magnetic tape units and a tape control unit with a fair market value of $ 157,923 (the "Equipment"). Comdisco, a publicly-held Delaware Corporation, is unrelated to Finalco and is a competing equipment leasing company that buys and sells new and used IBM computer equipment and arranges leases of such equipment. During the years in issue, Comdisco had no shareholders, officers, directors, or employees in common with Finalco. The Comdisco Purchase Agreement stated the fair market value of all equipment sold to Bluewood to be $ 2,776,500, however, the negotiated purchase price paid by Bluewood was stated as $ 2,070,545.81 payable as follows: Recourse Promissory Note
$ 276,650.00  Equipment Rental Proceeds
1,793,895.81
Total     $ 2,070,545.81
*679 Title to the Equipment was transferred from Comdisco to Bluewood, and then to Finalco, subject to an existing bank lien placed by Continental Illinois National Bank and Trust Company (the "Bank"), which provided Comdisco with acquisition financing. Title to all the equipment was transferred to Bluewood also subject to the recourse promissory note in the amount of $ 276,650 issued by Finalco in favor of Comdisco, and the lease to Beneficial Merchandise Data Processing Corporation (the "End User"). The lease to the End User ("End User Lease") was a typical commercial triple net lease with an initial term of 60 months, beginning April 4, 1977, which did not contain a purchase option. Bluewood entered into a Management and Remarketing Agreement with Comdisco (the "Comdisco Management and Remarketing Agreement"), which provided that Comdisco would manage the property until September 30, 1985, at which time neither party could terminate the agreement upon 30 days written notice. If such agreement was not terminated after September 30, 1985, Comdisco had the right to attempt to sell or re-lease the Equipment. The Comdisco Management and Remarketing Agreement provided that Comdisco *680 would solicit offers from third parties to re-lease the Equipment. Comdisco was required to obtain written consent by the Owner to execute a re-lease of the Equipment except any re-lease executed prior to the expiration date and not extending beyond the expiration date of such Agreement. A schedule appended to the Comdisco Management and Remarketing Agreement allocated remarketing proceeds from the sale or re-lease as follows: ten percent of net sales proceeds or net rentals to the party remarketing the Equipment either Owner or Agent; next thirteen percent of fair market value of Equipment as of closing date to Owner; then seventy-five percent to Owner, 25 percent to Agent
The Comdisco Management and Remarketing Agreement provided Comdisco the option to reacquire the Equipment from Bluewood in exchange for equipment of the same model number and condition as the Equipment. By letter dated January 31, 1984, Finalco advised petitioner that under rights granted to Comdisco under the Comdisco Management and Remarketing Agreement, Comdisco wished to exchange one of the IBM 3420 tape units on sublease to the End User from Finalco for an identical unit then on lease to Texas *681 Instruments. Petitioner acknowledged and accepted this equipment exchange on February 21, 1984. The record does not indicate the benefit received by Comdisco on the exchange. Entry Into The Transaction
In the Fall of 1978, Robert Prigge ("Prigge"), C.P.A., contacted petitioner and recommended an equipment leasing investment. Petitioner had relied on Prigge for accounting services and investment advice for over 20 years. Prigge introduced petitioner to Gerald DuBois ("DuBois"). At that time DuBois was a self-employed individual who sold investments in computer equipment leasing transactions. DuBois described leveraged computer lease transactions and discussed the potential risks the investor faced, including the investor's obligations with respect to the promissory notes required in the arrangement. DuBois represented that to be profitable the equipment had to be re-leased or sold at the end of the leaseback. DuBois usually told investors to expect the equipment to have a residual value at the end of the leaseback term of 20 to 25 percent of the cost of the equipment. Petitioner relied on the representation of DuBois regarding the residual value of the Equipment. *682 Neither petitioner nor Prigge sought an independent appraisal of residual value. Petitioner understood that DuBois was an agent for Finalco. DuBois presented a projected profit and loss statement prepared by Finalco that showed the anticipated after tax savings from 1978 through 1982 inclusive were projected to be $ 45,525; the anticipated tax liability due on profits from 1983 through 1986 was projected to be $ 30,976. The net after-tax savings were expected to be $ 14,549 during the entire transaction. Petitioner's cash investment was $ 25,000. As proposed, petitioner would buy the Equipment from Finalco at a purchase price of $ 157,923. A portion of the purchase price together with interest would be payable in four annual installments. The balance of the purchase price, together with interest, would be payable in 96 equal monthly installments. Petitioner understood that the lease payments due from Finalco equaled the payments which he was required to make to Finalco under the installment note; however, petitioner did not understand that the installment note was a nonrecourse note. Petitioner did not understand the guarantee or terms of the obligation guaranteed. Petitioner *683 did not inquire as to the extent and nature of his personal liability in the transaction and did not consult with an attorney. Petitioner understood that Finalco would leaseback the Equipment for a pperiod of eight years and that the Equipment was subject to the End User Lease. Before making a decision, petitioner contacted the End User. Petitioner made general inquiries regarding the Equipment. The End User provided no estimate of residual value of the Equipment. Petitioner did not know the terms of the End User Lease. DuBois did not discuss the Comdisco Management and Remarketing Agreement with petitioner. Petitioner was not aware of the role and interest retained by Comdisco in the transaction, even though petitioner signed the Agreement as to Prior Liens, Encumbrances and Assignments which referenced the Comdisco Management and Remarketing Agreement. The End User would not have reasons to be informed of petitioner's mechanics of the transaction. Petitioner was unaware that Comdisco retained benefits in the transaction related to the End User including an equipment exchange option of significant importance to petitioner as owner of the Equipment. Petitioner was aware *684 that Finalco retained a residual interest in any remarketing proceeds generated by Finalco. Petitioner confirmed that he "would have to rely on some help, obviously, so they would be good." Petitioner did not attempt to negotiate any terms of the transaction including the residual interest of Finalco. Neither petitioner nor Prigge performed any economic analysis regarding the residual value of the Equipment. Consequently, petitioner was unaware of the required residual value of the Equipment necessary to earn an economic profit. Purchase by Petitioner
On December 30, 1978, petitioner executed a purchase agreement ("the Purchase Agreement") in which he agreed to purchase the Equipment from Finalco for $ 157,923, the published price in the January, 1979 issue of the Computer Price Guide, (the "Blue Book") which was prepared in December of 1978. [6] In payment of the purchase price, petitioner signed a recourse promissory note (the "Recourse Note") for $ 25,000. The Recourse Note provided for an initial cash payment of $ 3,000 and four subsequent annual payments of principal and interest at the rat of ten percent per annum on the outstanding balance. The Recourse Note granted *685 Finalco a security interest in the Equipment. Petitioner made the four annual payments of principal and interest as required by the Recourse Note, including a late payment charge assessed by Finalco on the final payment. The interest payments on the Recourse Note in the aggregate were the amount of $ 4,100. On December 30, 1978, petitioner signed an Installment Note in favor of Finalco, dated December 1, 1978, in the amount of $ 132,923 ("Installment Note"). The Amortization Schedule attached to the Installment Note provided for interest at the rate of 8% per annum and 96 monthly payments of $ 1,866.65, beginning January 1, 1979. In the event of default by petitioner, the holder of the Installment Note has the option to declare all obligations under the Installment Note due and payable. To secure the obligation *686 represented by the Installment Note, petitioner granted Finalco a security interest in the Equipment and any lease of the Equipment and the proceeds from any transfer of the Equipment. The Installment Note also provided that, in consideration of Finalco's having advanced funds under the Installment Note, petitioner guaranteed a certain amount of Finalco's purchase money obligation incurred under the Comdisco Purchase Agreement and that the amount guaranteed would be a recourse obligation of petitioner. Except to the extent of a recourse amount, determined by Finalco to be $ 65,000, petitioner's obligations under the Installment Note could be satisfied only out of the rent and other proceeds of the Equipment. On December 30, 1978, petitioner executed a Guarantee of Payment in which he guaranteed on a full recourse basis the obligation of Finalco owed to the Bank in an amount not to exceed $ 65,000 (the "Guarantee"). The Guarantee is to be in force until January 1, 1987 or until the guaranteed amount is paid, whichever is first. Finalco maintained a record which indicated that the guarantee expired in 1982 which year corresponded with the year in which the transaction generated *687 a profit. The guaranteed amount of $ 65,000 was calculated by Finalco to be equal to the amount by which losses expected to be claimed by petitioner exceeded the Recourse Note amount of $ 25,000. The Guarantee was transmitted to and acknowledged by Comdisco. On January 16, 1979, Finalco prepared a second projected profit and loss statement for petitioner that was the same as the projection prepared November 22, 1978 except that the new projection reflected equity payments being made over 5 years instead of one $ 25,000 payment in the first year. In November of 1979, petitioner signed an Agreement of Assumption as additional security by which petitioner purportedly assumed, on a recourse basis, $ 65,000 of the principal balance of a debt owed by Finalco, as an assignee of Comdisco, to the Bank. In a cover letter sent by DuBois to petitioner, DuBois indicates, that in an effort to comply with the anticipated regulations of respondent concerning the at risk provisions of section 465, "Finalco has suggested that you sign the attached Assumption Agreement thereby in advance of the proposed changes to be in compliance." Owner Lease to Finalco
On December 30, 1978, petitioner *688 signed the Lease Agreement ("Owner Lease") between petitioner and Finalco, dated December 1, 1978, providing that Finalco would lease back the Equipment from petitioner. The term of the Owner Lease was 96 months, commencing December 1, 1978, and terminating November 30, 1986 (the "Original Term"), at a monthly rental of $ 1,886.65. The rent payable by Finalco pursuant to the Owner Lease provided sufficient revenue to allow petitioner to amortize the Installment Note. The Owner Lease provided Finalco the following options: (a) Termination after 12 months by paying a termination value (which was stated as a percentage of the original cost, depending upon the time of termination); (b) Purchase the Equipment from petitioner after the expiration of the Original Term at fair market value; (c) Exchange the Equipment for equipment of equal fair market value. The Lease provided that upon default by petitioner, Finalco could terminate the Lease by paying termination value and redelivering the Equipment to petitioner. Upon default by Finalco, petitioner could declare the exercise of the termination option by Finalco and sums accrued and unpaid would become due. In addition, petitioner *689 would have the option to terminate the lease, take possession of the Equipment, re-lease the Equipment, and sell the Equipment and apply the net proceed to Finalco's obligation under the Owner Lease. Upon expiration or termination of the Owner Lease, Finalco was obligated, at its expense, to deliver the Equipment to a location specified by petitioner. Finalco accepted the Equipment as installed and operational and that the commencement date of the lease payments under the Finalco Lease was December 1, 1978. Remarketing
The Purchase Agreement provided that petitioner pay Finalco 30 percent of any and all sums received where Finalco provides remarketing services to arrange the sale or re-lease of the Equipment. Finalco retained the right of first refusal in any sale or re-lease not presented by Finalco. The Purchase Agreement does not reference the Comdisco Management and Remarketing Agreement with respect to the effect of the remarketing provisions of the Purchase Agreement where Comdisco remarkets the Equipment. The Comdisco Management and Remarketing Agreements is referenced in a document titled "Agreement as to Prior Liens, Encumbrances, and Assignments" dated December 1, 1978 which *690 petitioner signed at the time of entry into the transaction on December 30, 1978. According to Olmstead, Finalco is entitled to a 30 percent commission if and only if it is responsible for the sale or re-lease of the Equipment. According to Phillip Hewes ("Hewes"), a staff attorney at Comdisco who drafted the Comdisco Management and Remarketing Agreement, Comdisco is entitled to a commission if and only if Comdisco is responsible for the sale or re-lease of the Equipment. Hewes provided no indication that Comdisco intended to manage and remarket the Equipment beyond the initial use of the End User or to otherwise service petitioner as Owner beyond such time as the End User terminated the use of the Equipment. The terms of the Comdisco Management and Remarketing Agreement indicate that such Agreement was drafted to benefit Comdisco and was a necessary requirement of the sale to Finalco pursuant to the Comdisco Purchase Agreement. Practice of Dating Documents
Although petitioner signed the Purchase Agreement and related documents on December 30, 1978, the documents bore the date December 1, 1978. According to Olmstead, Finalco's dating practices were established for legitimate *691 business reasons and were not motivated by tax consequences. Finalco generally dated the documents transferring title to equipment on or before the date of the end user lease so that the banks that financed the acquisition of the equipment would have a first perfected security interest in the equipment. According to Olmstead, Finalco's practice was never to date documents, however, in a year prior to the tax year in which the investor purchased the equipment; if the investor purchased the equipment in the last half of a taxable year, the documents were never dated in the first half of the taxable year. Industry Conditions
The market for third party leasing of computer equipment developed rapidly in the 1970's. Projections of residual values are critical to evaluate an investment in computer equipment. Such projections vary among experts and fluctuate with market conditions. Computers do not depreciate with age, but rather are subject to technological obsolescence. Because IBM dominates the computer industry, the technology advancements of IBM products have significant impact upon the residual value of progenitors. Industry experts have had varied success in the ability *692 to predict technology advancements of IBM. The volume of used computer equipment transactions can be discerned from the advertisement of the weekly trade journal Computer World. IBM has the largest market share and IBM computer prices are evidenced in the Blue Book. The computer industry has been dominated by the technological advancements and the strategic product planning of IBM for nearly three decades. In 1964, IBM introduced the IBM 360 Series of computers. The 360 unified a diverse line of computers into a single new compatible family. In 1971, IBM introduced the 370 series. The available 370 configurations were designed to extend from low demand end users to high demand end users. The sales performance of mid-range products was unsatisfactory to IBM. High demand end users were willing to acquire the latest technology thereby creating a market demand for high demand end users. The emergence of a significant market in the low demand end user market created a market demand for low demand end user products. In June of 1976, IBM announced the 370/138 and the 370/148 computers which were designed to enhance the sales performance of the products within the mid-range 370 *693 series. The price performance capabilities of the 370/138 and 370/148 out distanced the earlier 370 series computers. The initial market reaction was highly favorable such that during 1977 the fair market value in the used equipment market of 370/138 and the 370/148 exceeded the IBM list price. The computer industry was generally tranquil during the mid-1970's. In March of 1977, IBM introduced the 303X computer. Despite introduction of the 303X and the IBM price reductions on the 370/158 and 370/168, prices of used computers remained at relatively high and stable values. The Blue Book stated in the July 1977 issue that most of the equipment in general use at that time will have substantial value at the end of the 1980's. In October of 1977, IBM announced two additionnal 303X computers, the 370/3032 and 370/3031. Datamation magazine, an industry publication, noted that the new processors were so similar to the 370/158 and the 370/168 that "the industry yawned as IBM this fall announced the much rumored 3031 and 3032 central processor." The 370/158 and 370/168 were of comparable price performance capabilities to the 370/303X family. During the late 1970's, IBM was faced with *694 increased competition from manufacturers of plug compatible equipment, imitation IBM equipment designed to displace IBM equipment, particularly plug compatible central processors. IBM also faced increased competition from manufacturers of mini computers. In January of 1979, IBM introduced the 4300 series. The industry had not expected the drastic increase in the price performance capabilities presented by the 4300 series. The IBM marketing strategy undertaken to react to the plug compatible processors and the mini computer market significantly reduced the previous prognostications of mainframe residual values. While the mainframe market was devastated following the introduction of the 4300 series in January of 1979, the market for peripheral equipment remained somewhat stable. The primary factor for such occurrence was that most peripheral equipment for the 360 and 370 series was compatible with the 303X series and significantly, the 4300 series. The residual value of IBM peripheral equipment for any such series was generally insulated from the adverse market effect of subsequently introduced central processors due to the compatability of most peripheral equipment precluded *695 the rapid technological advancements inherent to mainframe products. Expert Testimony of Value and the Equipment
Esmond C. Lyons, Jr. ("Lyons") was qualified to testify as an expert on behalf of petitioner. Lyons is the principal management consultant in the Information, Services and Systems Division of SRI International ("SRI"), formerly renowned as the Stanford Research Institute. SRI is a not-for-profit corporation which is involved in technology research and management consulting for business and government clients. Dee Morgan ("Morgan") was qualified to testify as an expert on behalf of respondent. Morgan has worked for IBM as a systems service representative. From 1965 through 1983, Morgan was employed by the General Services Administration ("GSA") as a computer equipment analyst and data processing systems coordinator. While employed with GSA, Morgan provided estimates of residual value and economic life of computer equipment to the Defense Contract Audit Agency. The Equipment included IBM peripheral equipment with features as follows: IBM
Model
Quantity
Equipment
Feature
Description
1
3803-1
Tape Control
8100
2-Channel Switch
3551
9TK-800BP1
2
3420-5
3550
Tape Unit
6
3420-5
6631
Tape Unit
*696 The odd-numbered models of the IBM 3420 tape units were just installed in October of 1971. A subsequent upgrade in the series was delivered to the market in October of 1973. The model feature 3550 is a dual density feature. The model feature 6631 is a single density feature. Lyons testified that petitioner paid 76 percent of the December IBM list price of $ 206,355 for the Equipment. At that time the Blue Book quoted 79 percent of the IBM list price as the asking price for the Equipment. Petitioner paid $ 157,923 which Lyons concluded to be a very beneficial price. Lyons testified that it would have been reasonable to expect an 8-year residual value of the 3803-1 to be between $ 5,000 and $ 8,000 or approximately 20 to 30 percent of the IBM list price; and such residual value of the 3420-5 to be between $ 4,500 and $ 6,500 or approximately 15 to 20 percent of the IBM list price. According to Lyons, the cumulative residual value of the Equipment would have been between $ 31,000 and $ 41,000 or within the range of fifteen to twenty percent of the IBM list price. Morgan testified that as of January of 1979, the Blue Book, which went to press in December of 1978, reflected *697 the fair market asking price for the Equipment of $ 157,500. Morgan concluded that the actual fair market as of the Equipment should be lower than the Blue Book due to the negotiation of asking prices. Morgan further concluded that no basis existed in 1978 to predict a residual value in excess of zero as of November, 1986. Tax Reporting
Petitioner is a cash-basis taxpayer reporting on a calendar year basis. After the close of calendar year 1978, petitioner received from Finalco a document entitled "Tax Summary for the Period Ended 12-31-1978," setting forth the following information which was used by petitioner in filing his 1978 United States Income Tax Return: Finalco Lease Income
$ 1,866.65  Expenses (Depreciation)
(23,688.45)
Taxable Income
(21,821.80)
Finalco also sent petitioner a completed Class Life Asset Depreciation Range System Form 4832 for 1978, a copy of which was attached to petitioner's 1978 return. For each of calendars years 1979 through 1982 inclusive, petitioner reported on his United States Income Tax Return a net loss from his equipment purchase and leaseback transaction with respect to the Equipment, as follows: *698 Taxable Year Ended
Net Loss
December 31, 1978
$ 21,821.80
December 31, 1979
$ 30,108.32
December 31, 1980
$ 16,101.17
December 31, 1981
$ 12,310.68
December 31, 1982
$ 10,707.25
For each of calendar years 1983 and 1984, petitioner reported on his Federal income tax return taxable income from his equipment purchase and leaseback transaction with respect to the Equipment, as follows: Taxable Year Ended
Taxable Income
December 31, 1983
$ 3,851.06 December 31, 1984
$ 18,418.00
For calendar year 1985, it was projected by Finalco that petitioner will recognize taxable income from his equipment purchase and leaseback transaction in the amount of $ 19,946.00. OPINION The present case is a companion case selected as a representative test case for a large number of dockets involving the investment in Finalco arranged sale and leaseback transactions of leveraged computer equipment. [7] The issues presented here are similar to those presented in the companion cases except that the transactional structuring differed in certain pertinent respects. *699 At the outset, we address respondent's primary assertion that petitioner's transactions with respect to the Equipment was a tax-avoidance scheme devoid of economic substance which is to be disregarded for Federal income tax purposes. Petitioner asserts that ownership of the Equipment for Federal income tax purposes has been established where petitioner entered the transaction with the requisite business purpose and the transaction was supported by economic substance. Taxpayers are generally free to structure their business transactions as they please, though motivated by a tax reduction considerations. Gregory v. Helvering,293 U.S. 465 (1935); Rice's Toyota World, Inc. v. Commissioner,81 T.C. 184, 196 (1983), affd. on this issue 752 F.2d 89 (4th Cir. 1985). However, it is well settled that a transaction entered into solely for the purpose of tax reduction and which is without economic, commercial or legal purpose other than the expected tax benefits is a sham without effect for Federal income tax purposes. *700 Frank Lyon Co. v. United States,435 U.S. 561 (1978); Rice's Toyota World, Inc. v. Commissioner,81 T.C. at 196; Grodt & McKay Realty, Inc. v. Commissioner,77 T.C. 1221, 1243 (1981). The existence of tax benefits accruing to an investor does not necessarily deprive a transaction of economic substance. Frank Lyon Co. v. United States, supra;Estate of Thomas v. Commissioner,84 T.C. 412, 432 (1985). In the sale and leaseback context, we set forth a standard that the nonuser-owner recipient of tax benefits must specifically establish that the entry into the transaction was motivated by business purpose to justify the form of the transaction and that the transaction was supported by economic substance. Rice's Toyota World, Inc. v. Commissioner,81 T.C. at 201-203. [8] In Rice's Toyota World, Inc., we stated that the tests developed under the sham transaction doctrine are applied to determine whether a threshold level of business purpose or economic substance is present. *701 Rice's Toyota World, Inc. v. Commissioner,81 T.C. at 196. [9]
Our inquiry of business purpose and economic substance is inherently factual as indicated in several recent cases concerning sale and leaseback transactions of computer equipment. Torres v. Commissioner,88 T.C. 702 (1987); Bussing v. Commissioner,88 T.C. 449 (1987), supplemental opinion 89 T.C.    (Nov. 24, 1987); Gefen v. Commissioner,89 T.C. 1471 (1986); Mukerji v. Commissioner,89 T.C. 926, 968 (1986); James v. Commissioner,89 T.C. 905 (1986); Coleman v. Commissioner,89 T.C. 178 (1986); affd. per curiam 833 F.2d 303 (3d Cir. 1987); *702 Estate of Thomas v. Commissioner, supra; Rice's Toyota World, Inc. v. Commissioner, supra.[10]
We noted in Rice's Toyota World that the drawing of a precise line of demarcation between valid and invalid transactions is invariably difficult. Rice's Toyota World, Inc. v. Commissioner,81 T.C. at 197. In this context, petitioner bears the burden of proof as respondent's determination that the transaction was a tax-avoidance scheme devoid of economic substance is presumptively correct. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). Based on our review of the record herein, we conclude that the transaction was not motivated by a business purpose and was devoid of economic substance so as to be disregarded for Federal income tax purposes. We are convinced that petitioner did not manifest the requisite subjective business purpose at the time of entry into the transaction. Petitioner relied upon the advice of Prigge and the representations of DuBois. Prigge had provided petitioner with *703 tax advice for several years. DuBois as an agent of Finalco had an obvious self-interest as to whether petitioner entered the transaction. Petitioner was aware that residual value was critical as to whether the transaction was profitable, yet neither petitioner nor Prigge investigated the Equipment to ascertain a reliable estimate of residual value. DuBois represented that the Equipment should retain a residual value of 20 to 25 percent of the purchase price. Neither petitioner nor Prigge calculated the requisite residual value necessary to profit from the transaction. Furthermore, petitioner acknowledged that he would "obviously" require assistance in the sale or re-lease of the Equipment; yet, neither petitioner nor Prigge were impelled to estimate the required residual value necessary to compensate Finalco and return an economic profit to petitioner. Based on our discussion below, simple mathematics demonstrates that the transaction was structured to provide tax benefits to petitioner and economic profit to Finalco. Petitioner contends that contact with the End User demonstrates subjective business purpose. We found such testimony to be self-serving and merely to approximate *704 a general inquiry of the End User. Petitioner was not aware of the role of Comdisco in the transactions of the interest of Comdisco pursuant to the Comdisco Management and Remarketing Agreement. The Comdisco Management and Remarketing Agreement provided Comdisco valuable management and remarketing interests in the Equipment. Petitioner did not consult an attorney regarding the personnel liability aspects of the transaction and failed, at trial, to demonstrate a basic understanding of the personal liability aspects of the transaction. Based on our examination of the entire record, we find that petitioner did not manifest a business purpose at the time of entry into the transaction. The focus of our inquiry is to perform an objective analysis of the transaction to determine whether any realistic opportunity for economic profit existed exclusive of the propitious tax benefits. In the context of our inquiry, we analyze the transaction as a prudent investor. Rice's Toyota World, Inc. v. Commissioner,81 T.C. at 209. We recognize that our determination cannot depend on unrealistic demands for certainty. *705 Gefen v. Commissioner, 87 T.C. at 1492. The parties rely on expert testimony to establish the fair market value and residual value of the Equipment on December 30, 1979. We are not bound by the opinion of any expert witness when that opinion is contrary to our own judgment. Chiu v. Commissioner,84 T.C. 722, 734 (1985). We may embrace or reject expert testimony, whichever, in our best judgment, is appropriate. Helvering v. National Grocery Co.,304 U.S. 282 (1938); Silverman v. Commissioner,538 F.2d 927, 933 (2d Cir. 1976), affg. a Memorandum Opinion of this Court. Based on our analysis of this record we find that the transaction was not supported with economic substance even where we accept the highest residual value offered by petitioner's expert, Lyons. [11]
*706 We must determine whether the transaction offered a realistic opportunity for economic profit exclusive of Federal income tax benefits. In this transaction, the analysis of economic profit depends solely on the residual value of the Equipment. The Owner Lease provided no cash flow to petitioner as rent due by Finalco exactly offset petitioner's Installment Note obligation. We view such occurrence as a neutral commercial reality in our determination. Estate of Thomas v. Commissioner,84 T.C. at 436. The Owner Lease provided no interim revenue sharing provisions such that petitioner had no opportunity to share in rental proceeds prior to the termination of the Owner Lease. The residual value of the Equipment provided the sole source of economic return to petitioner. We view as pivotal in our determination of economic substance the role and effect of the remarketing interest retained by Finalco. Pursuant to the remarketing provision of the Purchase Agreement, Finalco was entitled to 30 percent of all sums received from the sale or re-lease of the Equipment. According to Olmstead, the remarketing provisions required Finalco to perform such services to be entitled *707 to the 30 percent compensation. Petitioner argues that, as owner of the Equipment, he may select any individual or entity other than Finalco to remarket the Equipment. In Rice's Toyota World, Inc., Finalco retained a 30 percent interest in any revenue generated either through sale or re-leasing of the equipment irrespective as to whether Finalco actually performed any remarketing services. Rice's Toyota World, Inc. v. Commissioner,81 T.C. at 195. [12] Notwithstanding that the remarketing provisions within the Purchase Agreement indicate that Finalco must remarket the Equipment to be entitled to the 30 percent compensation, we find that petitioner intended to rely on Finalco for such services and that the substance of the transaction is that petitioner must rely on Finalco to remarket the Equipment. Petitioner is an opthamologist with experience and resources woefully inadequate to remarket the Equipment without assistance. We believe *708 that petitioner as individual owner of peripheral computer equipment such as the Equipment comprising certain computer components to a computer system on lease to the End User must in substance rely on Finalco for the sale or the re-leasing of the Equipment. The record does not indicate that other dealers of computer equipment in the secondary market were available and capable to remarket Equipment under conditions more favorable to petitioner. Finalco knew the location, status, and condition of the Equipment. We find it a fair inference that Finalco was relied upon by petitioner and was the sole source of expected assistance in any remarketing effort of petitioner at the termination of the Owner Lease. [13] Our determination to factor the 30 percent commission due to Finalco in our objective analysis is indeed appropriate. James v. Commissioner,87 T.C. at 923 n.4. *709 Lyons offered the view that the residual value of the Equipment would be within the range of $ 31,000 to $ 41,000. Lyons' projections did not account for petitioner's equity investment or any remarketing fees payable to Finalco. Lyons valued the Equipment without consideration of the net return of economic profit to petitioner. We accept for the sold purpose of illustration that the Equipment residual value at the termination of the Owner Lease was $ 41,000. Based on our analysis, petitioner cannot recoup his equity investment. [14]
Our analysis does not account for the time value of money concept. Cf. Rice's Toyota World, Inc. v. Commissioner,81 T.C. at 206. [15] Our view is that the transaction as structured provided economic benefit to Finalco pursuant to the terms of the Purchase Agreement and Owner Lease and to Comdisco pursuant *710 to the extensive interests in the Comdisco Management and Remarketing Agreement such that the primary benefit to petitioner was the acquisition of tax benefits. The inescapable conclusion is that petitioner's Finalco transaction was a tax-avoidance scheme devoid of economic substance to be disregarded for Federal income tax purposes. In sum, we find here substantially the same transaction as was before us in Rice's Toyota World, Inc., although in somewhat different form. But as substance must prevail over form in this area of tax litigation, we would be remiss in not concluding that the arrangement before us was lacking the right stuff of economic substance. In this respect, it is obvious that all of the economic benefits of this leveraged transaction, other than the tax benefits, were retained by Finalco and Comdisco to the lesser extent provided in the Comdisco Management and Remarketing *711 Agreement. In Rice's Toyota World, Inc., Finalco retained a 30 percent interest in all revenue generated from the computer equipment after the original term of the taxpayer's lease. In this instance, the residual interest was couched in contingent terms dependent upon Finalco's remarketing services. It is axiomatic in the law of Federal taxation that, "A given result at the end of a straight path is not made a different result because reached by following a devious path." Minnesota Tea Co. v. Helvering,302 U.S. 609, 613 (1938). Essentially, the instant case presents the tune of Rice's Toyota World, Inc., with an insignificant change in the lyrics. In Rice's Toyota World, Inc., the Court of Appeals for the Fourth Circuit determined that a sham determination did not preclude the deduction of interest paid on a recourse installment note. Rice's Toyota World, Inc. v. Commissioner, 752 F.2d at 96. In Rose v. Commissioner,88 T.C. 386, 423 (1987), we accepted the view of the Court of appeals for the Fourth Circuit. Petitioner paid interest on the Recourse Note which shall be allowed as a deduction pursuant to section *712 163. By Amendment to Answer, respondent asserts the increased rate of interest provisions of section 6621(c) attributable to tax-motivated transactions. Respondent bears the burden of proof. Rule 142(a); Rose v. Commissioner, supra;Zirker v. Commissioner,87 T.C. 970 (1986). Section 6621(c) provides for an interest rate of 120 percent of the adjusted rate determined under section 6621(b) where there is a substantial underpayment in any taxable year attributable to one or more tax-motivated transactions. A substantial underpayment exists where such underpayment attributable to a tax-motivated transaction exceeds $ 1,000. Sec. 6621(c)(2). Section 6621(c) is applicable solely with respect to interest accruing after December 31, 1984, even though the transaction was entered into prior to the date of enactment of section 6621(c). Solowiejczyk v. Commissioner,85 T.C. 552 (1985), affd. per curiam without published opinion 795 F.2d 1005 (2d Cir. 1986). Respondent asserts the provisions of section 6621(c) are applicable because the transactions at issue are defined as tax-motivated transactions where losses were disallowed *713 by reason of section 465(a). Sec. 6621(c)(3)(A)(ii). We have determined that the Equipment transactions were tax-motivated schemes devoid of economic substance. Section 6621(c)(3)(A)(v) was added by Congress to specifically include within the definition of tax-motivated transactions any "sham or fraudulent transaction." [16] We have previously determined that "any sham or fraudulent transaction" within the meaning of section 6621(c)(3)(A)(v) includes a transaction which lacked subject profit motive and which was without economic substance. Patin v. Commissioner,88 T.C. 1086, 1128-1129 (1987). We have recently determined that the presence of profit motive does not preclude the determination that a transaction lacks economic substance and is, therefore, a sham. Cherin v. Commissioner, 89 T.C.    (Nov. 23, 1987). In this case, we determined that petitioner did not manifest a subjective profit motive and that the Equipment transactions were not supported with economic substance. Consequently, petitioner is liable for additional interest on the substantial underpayment of tax attributable to a tax-motivated transaction within the meaning of section 6621(c)(3)(A)(v) *714 where the Equipment transactions are transactions determined to be shams or fraudulent transactions. Decision will be entered under Rule 155.
Footnotes
1. Petitioner Patricia Casebeer was not a party to any transaction at issue herein and is a petitioner in this action solely by reason of filing a joint Federal income tax return for each of the taxable years involved. Unless otherwise specified, petitioner shall refer only to petitioner Harvey L. Casebeer. ↩
2. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in question. All rule references are to the Tax Court Rules of Practices and Procedure. ↩
3. Former sec. 6621(d) was redesignated as sec. 6621(c)↩ pursuant to sec. 1511(c), Tax Reform Act of 1986, 100 Stat. 2744. We use the reference to the Internal Revenue Code as redesignated and amended. 4. Peripheral computer equipment feeds information into and out of the central processing unit. The central processing unit, sometimes referred to as mainframe equipment, actually performs the data processing function. ↩
5. The use of such terms as "purchase," "lease" and other like words does not imply that we consider the underlying transaction to be a fact construed as a "purchase" or "lease" for Federal income tax purposes. We probe beyond the labels given by the parties to determine whether an actual economic investment existed. Rice's Toyota World, Inc. v. Commissioner,81 T.C. 184, 210 (1983), affd. on this ground 752 F.2d 89↩ (4th Cir. 1985). 6. The Computer Price Guide is a quarterly journal published by Computer Merchants, Inc. The Computer Price Guide was the computer industry's first regularly published source of price and market information, both new and used computer equipment and widely relied upon in the industry. See Mukerji v. Commissioner,87 T.C. 926, 946-947↩ (1986). 7. The companion cases are: Larsen v. Commissioner, 89 T.C.    (1987); Sturm v. Commissioner,T.C. Memo. 1987-625; Moore v. Commissioner,T.C. Memo. 1987-626; Shriver v. Commissioner,T.C. Memo. 1987-627↩. 8. Carlson v. Commissioner,T.C. Memo. 1987-306↩. 9. The presence of business purpose does not entitle a transaction to be recognized for Federal tax purposes where objective indicia of economic substance indicating a realistic potential for economic profit are not manifest. Cherin v. Commissioner,↩ 89 T.C.    (Nov. 23, 1987). 10. Dobbs v. Commissioner,T.C. Memo. 1987-361; Kaufman v. Commissioner,T.C. Memo. 1987-350↩. 11. We find that the purchase price paid by petitioner in the amount of $ 157,923 was an approximate fair market value. Lyons viewed the purchase price as "beneficial". Respondent asserts that fair market value of the Equipment is evidenced in the Comdisco Purchase Agreement pursuant to which Finalco through Bluewood acquired certain computer equipment including the Equipment for the amount of $ 2,070,545.81. Such amount approximates 75 percent of the fair market value of the subject computer equipment as indicated in the Comdisco Purchase Agreement. Consequently, respondent asserts that the amount of $ 118,442 or 75 percent of $ 157,923 represents the fair market value of the Equipment as evidenced in the negotiated Comdisco Purchase Agreement. The Comdisco Purchase Agreement is not a comparable sale to petitioner's Purchase Agreement with Finalco. Petitioner paid the approximate Blue Book Value. Petitioner acquired a leverage lease program structured by Finalco with a lease commitment which fully amortized the Installment Note. We attribute a reasonable degree of value to such circumstances. See Mukerji v. Commissioner87 T.C. 926, 965 (1986); compare James v. Commissioner,87 T.C. 905, 920↩ (1986). 12. The terms and effect of the residual marketing interest in the Purchase Agreement retained by Finalco in the instant case are in substance no different than the residual interest retained in Rice's Toyota World, Inc.↩
13. Based on our review of the record, we determine that the interest of Comdisco in the Equipment pursuant to the Comdisco Management and Remarketing Agreement was intended to provide a benefit to Comdisco where the End User executed a renewal of the End User Lease. Comdisco located the End User and installed the Equipment. The End User aspect of the transaction was complete as of the date of transfer to Finalco through Bluewood. The End User Lease is a triple net 60-month lease to terminate in April of 1982 without an option to purchase. The Comdisco Management and Remarketing Agreement was to terminate in September 30, 1985 at which time either Comdisco or petitioner as owner may terminate upon 30 days notice. The Owner Lease was a 96-month lease to terminate in December of 1986. We are persuaded that Comdisco required the Comdisco Management and Remarketing Agreement as a condition of sale to Finalco. Phillip Hewes, the Comdisco staff attorney who drafted the Comdisco Management and Remarketing Agreement, provided no testimony as to whether Comdisco intended to solicit offers on behalf of petitioner other than from the End User. Petitioner was not aware of the role or the interest of Comdisco in the Equipment. Our conclusion is that Comdisco intended to benefit solely from any sale or re-lease of the Equipment to the End User or immediately upon termination of the End User Lease in April of 1982. If the Equipment remained on lease through Comdisco in September of 1985, Comdisco would retain an interest in remarketing the Equipment with the End User. In our view, Comdisco did not realistically expect the End User to continue to lease the Equipment until September of 1985. We are certain that Comdisco had no interest in dealing with petitioner where the Equipment was no longer on lease with the End User. Indeed in 1984, Comdisco exercised the option to exchange the Equipment for identical equipment. We assume such exchange benefited Comdisco not petitioner. We find no evidence that petitioner as the owner of the Equipment was able to select the most competitive source as petitioner asserts. Notwithstanding the testimony of Olmstead, the remarketing terms of the Purchase Agreement are not clear as to whether Finalco is entitled to remarketing compensation concerning "renewals under the lease" or "referral of a willing buyer or seller" where the End User renewed the Equipment during the term of the Comdisco Management and Remarketing Agreement. We note that as to petitioner, Finalco delivered the End User not Comdisco. In this context, we note that petitioner was not aware of the Comdisco Management and Remarketing Agreement, even though petitioner signed an agreement which mentioned the Comdisco Management and Remarketing Agreement. ↩
14. ↩
Residual Value
$ 41,000
Petitioner - 70 percent     28,700
$ 28,700
Finalco - 30 percent        12,300
$ 41,000
Petitioner Economic Profit
$ 28,700
Petitioner Equity Investment
Recourse Note
$ 25,000
Interest paid on Recourse Note
4,100
$ 29,100
$ 29,100
15. We have relied on discontinued cash flow analysis in some cases. Goldstein v. Commissioner,89 T.C. 535 (1987). As noted in Estate of Thomas v. Commissioner,84 T.C. 412, 440↩ n. 52 (1985), we decline to do so absent statutory guidance in this context. 16. Pub. L. 99-514, sec. 1535(a), 100 Stat. 2085, 2750. ↩